PRISCILLA MESSING v. JUDGE & DOLPH DRUG COMPANY, Appellant.—18 S. W. (2d) 408.

Division One, May 18, 1929.

*S. T. G. Smith* for appellant.

*Mark D. Eagleton* and *Hensley, Allen & Marsalek* for respondent.

906

SEDDON, C.—Suit for the recovery of damages for personal injuries claimed to have been suffered by plaintiff on July 6, 1923, while in defendant's employ. On the trial by jury, plaintiff was awarded damages in the sum of $25,000 by a unanimous verdict of the jury, which amount of damages was reduced by the trial court, by forced *remittitur*, to $18,000, and a judgment was entered in the latter amount in favor of plaintiff and against defendant. After proper preliminary procedural steps had been taken by defendant, the trial court allowed defendant an appeal to this court from the judgment so entered.

The amended petition of plaintiff thus states her cause of action:

"Plaintiff for amended petition states that defendant now is, and at all times herein mentioned was, a corporation duly organized and existing under and by virtue of law, and at all said times in its said business, defendant possessed, occupied and maintained a place of business in the city of St. Louis, Missouri, and that on or about July 6, 1923, plaintiff was in the employ of defendant engaged in her work on the third floor of said building in defendant's said place of business, and was in a very narrow and dimly lighted aisle or passageway thereof, stooping over, working with some small boxes at the floor there, and was near a certain small square-cornered shelf there about three feet above the floor attached to and projecting out about fourteen or eighteen inches from the wall there into said passageway, and that there were boxes or cartons piled high, to-wit, about six feet, at said aisle, and piled indiscriminately and in disorder and were not arranged, secured nor piled so as to prevent their falling; that boxes thereof fell and one of them struck plaintiff, causing plaintiff to move and assume an erect position, and in so doing the squared corner of said shelf struck plaintiff's back, causing her serious injury hereinafter stated, all of which directly and proximately resulted from negligence and carelessness of defendant, in this, to-wit:

"1. Defendant negligently failed to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work, in that the aforesaid place and aisle was very narrow and crowded and congested, and the plaintiff was required in doing said work to be at and under said shelf as aforesaid, and the said place thereabout was dark and dimly lighted, and plaintiff was likely to be injured as aforesaid and was in danger and was not reasonably safe.

"2. Defendant negligently failed to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work, in that the aforesaid boxes were piled indiscriminately and in disorder and were not adequately arranged, secured or fastened to prevent their falling, and they were likely to fall and cause injuries to persons thereabout, particularly plaintiff, and were dangerous and not reasonably safe.

"3. Defendant negligently ordered, required, caused and permitted plaintiff to be and work at the aforesaid place in the aforesaid manner and negligently assured plaintiff that she could do so with reasonable safety to herself, although defendant knew, or by the exercise of ordinary care could have known, that plaintiff in so doing was likely to be injured and was in danger and not reasonably safe.

"4. Defendant negligently failed to exercise ordinary care to inspect the aforesaid pile of boxes or the aforesaid conditions and place of work, or to discover the aforesaid conditions or dangers.

"5. Defendant negligently failed to exercise ordinary care to warn plaintiff of the aforesaid conditions or dangers.

"6. Defendant negligently failed to exercise ordinary care to adequately or sufficiently light, or have lighted, said place of work there, so as to be reasonably safe.

"7. Defendant negligently caused and permitted said boxes to be and remain piled in the aforesaid manner, not arranged or secured so as to prevent falling thereof, and said boxes were likely to fall and cause injury and were dangerous and not reasonably safe, and defendant knew, or by the exercise of ordinary care could have known, thereof in time to have prevented plaintiff's injuries.

"8. Defendant negligently caused, suffered and permitted said square-cornered shelf to be and remain at said place projecting into said passageway where it was likely to cause injury and was dangerous and not reasonably safe."

The amended answer denies generally the averments of the petition, and avers that "plaintiff knew, and for a long time prior thereto had known, of the conditions existing at and surrounding the place where she was at work on said July 6, 1923; that is, of the manner in which the said boxes were piled, and of the brightness of light, and of the width of the aisle and of the position occupied by said square shelf in defendant's place of business, and from her experience she was able to determine for herself whether said place was a reasonably safe place to work, and, knowing said conditions, she was guilty of negligence herself in selecting said place and pursuing her work there, if said place, because of said conditions, was not a reasonably safe place to perform her said labor in, and said negligence on her part directly contributed to whatever injuries, if any, plaintiff received on the occasion mentioned in her petition."

The reply is a conventional general denial of the averments of the answer.

The evidence discloses that defendant maintained and occupied a building at 508 St. Charles Street in the city of St. Louis, which was used as a pharmaceutical laboratory. The building is situate on the south side of St. Charles Street, and extends southwardly on Broadway to an alley between St. Charles Street and Locust Street. Plaintiff had been in the employ of defendant for about fifteen years continuously prior to the date of her alleged injury. She was a forewoman stationed on the third floor of said building, and had been employed in that particular building for some nine years prior to her alleged injury. Some eight or ten women employees of defendant worked on the third floor of the building, filling bottles and other receptacles with pharmaceutical preparations manufactured or prepared by defendant, and wrapping or packing the same for mailing and shipment. Plaintiff described her or-

dinary duties and employment thus: "I was forelady, and I gave the girls work to do and so forth; see that they had work; and answered the telephone." The superintendent, or general foreman, of defendant in charge of the third floor of said building was one J. D. McFarland, under whose general direction and supervision the plaintiff was working on the date of her alleged injury.

The defendant maintained, on and near the south side of the third floor of said building, a room about ten feet square, which was enclosed by glass sides or partitions and which is referred to in the record as a "dry room," which room was used for the purpose of drying out medicated tablets. Between the south side of this glass-enclosed dry room and the south wall of the building there was an aisle or passageway, which, according to plaintiff's evidence, was some three or four feet wide, but, according to defendant's evidence, was about seven feet wide. The passageway or aisle aforesaid extended east and west along the south, or alley, side of the building the full width of the building. The aisle was used by defendant as a storage place for paper cartons, wooden boxes, empty milk cans, raw materials, and empty receptacles and supplies of various kinds. It was also used somewhat infrequently by the plaintiff, and other employees of defendant working on the third floor of the building, as a passageway, and at times the employees used such passageway in getting for their use supplies and other material stored and kept therein. According to the testimony of defendant's superintendent, McFarland, "that is a pretty busy passageway, just not to be a general passageway, I think."

On the south side of the glass-enclosed dry room, there was fastened a wooden shelf or bracket, which extended or projected outwardly into the aforesaid aisle or passageway. The shelf consisted of a wooden board about one inch thick, with sharp, square corners. The top of the shelf was thirty-five and three-eighths inches above the floor level of the passageway, and the bottom of the shelf was thirty-four and one-half inches above the level of said floor. The shelf extended or projected out into the passageway about eleven inches, and was twelve inches wide. This shelf was used for the purpose of supporting a bucket or pail, into which a hose-pipe, leading from the dry room, discharged the moisture from the dry room. The shelf, or bracket, had been so maintained during the entire course and time of plaintiff's employment in the building.

Against the south wall of the passageway, and opposite the shelf just described, the defendant stored cardboard cartons, or boxes, each carton containing a gross, or 144, small empty vials or bottles, to be used as containers for medicated tablets and other pharmaceutical preparations. Each of said cardboard cartons or boxes was ten inches long, six inches wide, and about three inches deep.

It was customary for defendant to store the cardboard boxes or cartons in piles, approximately six feet high, on the south side of the aforesaid passageway, and opposite the south side, or glass-enclosure, of the dry room. The boxes or cartons were ordinarily piled one on top of another in rows, sometimes in three rows, and sometimes in two rows, depending upon the number of cartons in storage at the time. One row of cartons was placed against the south wall of the passageway, and the next row was placed immediately in front of the back row, and (if there happened to be three rows) the third row was placed immediately in front of the middle row of cartons. As the empty vials or bottles in the cartons were needed by the various employees of defendant for filling purposes, they were obtained and carried in the carton containers from the piles above mentioned to the stations of the several employees on the floor. As the piles were thus diminished from time to time, the cartons taken therefrom were replaced by other similar cartons, each containing a gross of empty bottles or vials.

About eleven or 11:30 o'clock on the morning of July 6, 1923, according to the testimony of plaintiff, she had occasion to enter and use the aisle or passageway described, on the third floor of defendant's said building, in order to obtain some flat cardboard patterns, to be fashioned by the employees on said floor and made up into boxes or cartons used for mailing and shipping medicines. The cardboard patterns were kept and stored in a large wooden box, resting upon the floor of the passageway near, and opposite to, the protruding shelf or bracket above described. Plaintiff testified that, in getting the cardboard patterns from the box, she had to stoop over, so that her back was near and somewhat beneath the protruding and overhanging shelf or bracket, and the rows or piles of cardboard cartons were piled alongside of her; that, as she was in a stooping posture in order to reach the cardboard patterns in the wooden box on the floor of the passageway, three or four cardboard cartons, each containing one gross of glass vials, fell from the top of one of the piles of such cartons, one of said cartons striking her upon the shoulder, thereby causing plaintiff to raise her back suddenly and to strike her spine upon one of the sharp square corners of the protruding and overhanging shelf, thereby inflicting the injury for which she seeks recovery. Plaintiff testified that the cardboard boxes or cartons were "very loosely piled," and had been so piled for "about a week or so" prior to her alleged injury; that she had seen the piles of cartons shake, and had seen cartons or boxes fall from the piles "about a week or so" before her alleged injury.

Inasmuch as defendant insistently claims and urges that plaintiff's own testimony disproves any actionable negligence on defendant's part, but, on the contrary, conclusively establishes plaintiff's

contributory negligence as a matter of law, we quote at some length portions of her testimony, developed under a rigid and sharp cross-examination by defendant's counsel: "Q. And these piles of these bottles were stacked six feet high? A. Yes, sir. Q. As tall as I am? A. Yes, sir. Q. So that they stood right up here, plainly up here? A. Yes, sir. Q. And it was where? Where was it that they were in a disordered condition? A. On the south side. Q. Well, they were standing here on the south of you, weren't they? A. Yes, sir. Q. Was it up near the top that they were standing disorderly? A. Yes, sir. Q. Or was it down here? A. All the way up. Q. They were standing all the way up, in a disorderly manner? A. Waggling. Q. By that you mean that the shaking of the building made them move, is that what you mean; that they were waggling like this? A. Well, I couldn't say. Q. What did you mean by waggling? A. They were packed up loose. They were shaky-like. Q. So that you saw them shake? A. I didn't notice them. Q. Well, how could you say they were shaky, if you didn't see them shake? A. I saw them. Q. Did you see them shaking? A. Yes, sir. Q. Then they must have been moving? A. Yes, sir. Q. So you saw them moving before you went in there? A. No, sir. Q. When? A. When they struck me I saw them. Q. Before you went in there did you see them shaking? A. No, sir. Q. Did you ever see them shaking before you went in there? A. Yes, sir. Q. So that you knew that these boxes were packed in a way that they were shaking, is that right? A. Yes, sir. Q. And you knew that long before you went in there that day? A. No, sir. Q. A week before, is that true? A. I can't understand you. Q. You knew that these boxes were in a shaky condition a week before? A. No, sir. Q. Didn't you? A. No, sir. Q. Didn't you see them there a week before? A. I seen them; yes, sir. Q. You saw them packed the same way, weren't they? A. Yes, sir. Q. Identically the same way? A. Yes, sir. Q. They were loose and waggly, were they not? A. I didn't see them at that time. Q. When did you first see them waggly? A. When I was struck. Q. You didn't see them waggly before, did you? A. Well, when I raised up. Q. This whole row of boxes didn't fall on you, did they? A. Three or four fell. Q. Three of them fell off the top? A. Yes, sir. Q. Is that what you want us to understand? A. Yes, sir. . . . Q. These boxes that you are talking about, and I am referring now to this pasteboard carton with the gross of bottles in, they were always piled up on that south wall, were they not? A. Yes, sir. Q. Generally two deep? A. Yes, sir. Q. So that for at least nine years you saw those boxes piled on that wall? A. Yes, sir. Q. During that time had those boxes been loosely piled and waggly in the building? A. Yes, sir.

Q. You saw them there all of that time for nine years? A. Yes, sir. Q. And you knew those boxes during that nine years were in that condition, loose and waggly? A. Yes, sir. Q. And you saw them fall? A. Yes, sir. Q. Many times? A. Yes, sir. Q. And you knew that they were likely to fall, is that right? A. Yes, sir. Q. And you had actually seen them fall yourself? A. Yes, sir. . . . Q. There is a light that seems to be pictured in this picture (photographic exhibit), right over the bracket? A. That was very dull. Q. Well, was there a light there? A. Yes, sir, but dull. Q. An ordinary electric light like we see there? A. Yes, sir. Q. It was hanging down on a cord? A. Yes, sir. Q. And it was right immediately over that bucket? A. Well, I couldn't say. Q. Well, don't you remember it there? A. No, sir; I don't remember it. Q. But you do say there was a light there? A. Yes, sir. . . . Q. But you did, didn't you, you knew that shelf was there? A. Yes, sir. . . . Q. Were these boxes that I have here, were they down here, further down this way? A. Yes, sir. Q. And they were loose and wobbly over here, too, weren't they? A. Yes, sir. Q. They were also up here, weren't they? A. Yes, sir. Q. And you realized at any time those boxes were likely to fall over, didn't you? A. No, sir. Q. You did not? A. No, Q. Even though they were loose and wobbly? A. No, sir. Q. Didn't they strike you like that, that they were loose and wobbly? A. Yes, sir. Q. And that they were likely to fall at any time? A. Yes, sir. Q. And you knew that they were likely to fall at any time, didn't you? A. Yes, sir. Q. And yet, in the face of that, you selected this place right down here. Now, how did you stoop, did you stoop over like this to get these things out, like I am stooping? A. Yes, sir. Q. Just like I am stooping. Where is that package? This was the stuff that you were down after? A. Yes, sir. Q. And you had to stand up once—when you got over here originally the first time, you were standing up straight? A. Yes, sir. Q. Now, then, when you stood there straight, did you stoop like I am stooping down, to get these out? A. Away down; yes, sir. Q. And then you would raise up and put them in a box? A. Yes, sir. Q. And then you would go down like this, and then you would pick up another one, is that it? A. Yes, sir. Q. How many times do you think you went down for these before the boxes fell? A. A little while. Q. Well, how many of these do you think you picked up? A. About twenty-five. Q. And all of the time you were stooping just exactly as I have been stooping? A. Yes, sir. Q. Always bending over full length like this? A. Yes, sir. . . . Q. You came up like this? A. Yes, sir. Q. And this shelf was sticking out here? A. Yes, sir. Q. And you say you struck yourself in the middle of the back? A. In the spine;

yes, sir. . . . Q. Now, what did you mean by the boxes being disorderly? A. They were put in kind of mussed. Q. Will you come down and show the jury just what you mean by that? A. They were not put in like that, they were put in shaky. Q. What do you mean? A. Like this they were (illustrating), they were like that. Q. Where did that packing start? A. From the bottom up. Q. Every one of those boxes contained a gross of bottles, didn't they? A. Yes, sir. Q. And you saw them packed like that? A. Yes, sir. Q. Would you say that they commenced down as low as a foot from the floor? A. They were packed more or less all the way up like that (illustrating). Q. Packed more or less like this? A. Yes, sir. Q. The outside row appeared that way? A. They were all like that. Q. You couldn't see the inside row, could you? A. No, sir. Q. You couldn't see the row against the wall? A. No, sir. Q. But you could see the outside row? A. Yes, sir. Q. And some of them were like you have got them here? A. Yes, sir. Q. And they looked very wobbly? A. Yes, sir. Q. As if they were about to fall all the time? A. Yes, sir. Q. And yet, knowing that condition, you walked back that way, did you? A. Went back there; yes, sir. Q. Now, then, you say that this box that you were working in was right down in front of that, is that right? A. A little farther this way. Q. Now, do you know when this box that fell off the pile struck you? A. Yes, sir. Q. Do you know whether it fell off the top of the pile? A. Yes, sir. Q. It fell that six feet; in other words, this here shelf was in the aisle about like that, wasn't it? A. Yes, sir; that shelf is a little higher than the other one. . . . Q. Now, you say that you were about a foot from this squared shelf when you were working in there, you were standing in that place there? A. Yes, sir. Q. And you had come there across this box to get in there? A. Yes, sir. Q. Did you step over this box to get in there? A. Yes, sir. Q. Stepped over this box, like this, to get in there? A. Yes, sir. Q. And it was while you were working in there that one of these boxes fell down? A. Yes, sir. Q. And struck you on the back? A. Yes, sir; two or three. Q. Two or three. Did they strike on the floor? A. No, sir; but me. Q. Only one hit you, didn't it? A. Yes, sir. Q. Fell, on the floor, from up here just like that (illustrating), is that what you mean? A. Yes, sir. Q. And did it make that kind of a noise? A. Well, it didn't break open. Q. The box didn't break open? A. Just a little bit; yes, sir. Q. You mean to say the box didn't break open? A. Yes, sir; the one broke open. Q. And didn't it make a noise? A. Yes, sir. Q. Did you say anything to anybody? A. Well, the girls knew all about it. Q. About a box falling? A. Yes, sir. Q. Did you say anything to anybody about a box falling? A.

Yes, sir. Q. Whom did you say it to? A. To the girls. Q. What girls? A. Some of the girls. Q. Which one? A. Lizzie Urklene. Q. You said it to Lizzie Urklene? A. Yes, sir. . . . Q. Well, that noise that was made here in this court room could easily have been heard, could it not, throughout the whole loft? A. If they were paying attention to it. Q. I am not talking if they heard it, I am talking about the noise traveling up and down through that loft? A. I should think so. Q. How many of those three boxes broke? A. I never noticed how many boxes broke. Q. You are sure one broke, but you are not sure whether it was more than one or not? A. The seals broke. Q. But one actually broke? A. Yes, sir. Q. Made a noise? A. Yes, sir. Q. Made a lot of noise? A. Yes, sir. Q. And was it the box that struck you, was it after you had struck the shelf and the box fell that you noticed the noise, or before? A. When it struck me on the shoulder. Q. That was the first one, wasn't it, or was that the third one? A. No, that is the first one. Q. That was the first one struck you on the shoulder? A. Yes, sir. Q. Well, what did you do? A. With that I heard the rest coming and I raised up immediately. Q. You heard two others coming? A. Yes, sir. Q. And those two didn't strike your body, but went down on the floor? A. Yes, sir. Q. And crashed? A. Yes, sir. Q. And it wasn't because those two boxes, or some of those boxes, were piled like this (illustrating), but they fell all the way off the top, didn't they? A. Yes, sir. Q. And was one of these boxes sticking out like that on the top? A. I never noticed that. Q. You never noticed that? A. No, sir. Q. So you can't tell whether it was that that caused the fall, or what it was that caused it? A. No, sir. Q. But you did see that they were packed in a wobbly and loose way? A. Yes, sir. . . . Q. Didn't you, as the head of the women workers in there—A. Yes, sir. Q.—have instructions from your employers— A. Yes, sir. Q.—that if anything to you didn't seem to be reasonably safe for the girls, that you were to tell them? A. Yes, sir. Q. You say, yes? A. Yes, sir. Q. And for two weeks, or for at least a week, while these boxes were wobbly, as you say, back of the glass partition room, you said never a word to Mr. McFarland about it, did you? A. Never paid no attention to it; no, sir. Q. Now, as a matter of fact, the light that was back there was just one single incandescent light, like that light there? A. Yes, sir. Q. And it was hanging back there right over where this bucket was, or in that vicinity? A. Yes, sir. Q. Well, with that light you could see these cartons in this box, could you not? A. Not very plainly; no sir. Q. Well, you could see them to stoop down to get them, couldn't you? A. Yes, sir. . . . Q. You could see these boxes of bottles piled back there two deep? A. Very

plain. Q. Beg pardon? A. Very plain. Q. You could see those back there, and you could see that they were not piled carefully; that is to say, they were wobbly and loose? You could see that, couldn't you? A. I never noticed that. Q. Well, you did see them back there, didn't you? A. I have seen them; yes, sir. Q. And you saw them? The only light that was back there was this incandescent light, wasn't it? A. Yes, sir. . . . Q. So that, what you say about these boxes and about the fact that they were in—that some of them were extending out a little bit, like I have them here (illustrating), and like you put them awhile ago, that was seen by that light? A. Very dull, though. Q. But you saw it? A. I never noticed it until I went under it. . . . Q. You worked some little time with this box, didn't you? A. Not very long. Q. Would you say as much as ten or fifteen minutes? A. Yes, sir. Q. And you were taking these out ten or fifteen minutes? A. Yes, sir. Q. And while you were taking these out ten or fifteen minutes, you saw the condition of those boxes? A. Well, I never noticed them when I went under there to do my work. Q. When was it you first noticed them? A. When they fell and struck me on the shoulder. Q. But you saw them fall off the top, didn't you? A. No, sir. Q. Didn't see them fall off the top? A. They fell off the top when I was stooping. . . . Q. Did you tell any of those [employees on the floor] that there were boxes fell at the time and struck your back? A. Well, I can't remember. Q. You wouldn't say that you told anybody that there were boxes fell down and caused you to jump against that squared shelf? A. I told the girls. Q. Whom did you tell? A. The girls. Q. Which ones? A. Lizzie Urklene. Q. You told Lizzie Urklene that? A. Yes, sir. Q. That the boxes fell down, and she was within ten feet? A. Yes, sir. Q. Of where you were hurt, wasn't she? A. Yes, sir. Q. At the time you were hurt? A. Yes, sir. Q. You mean to say that you told her that box fell down? A. Yes, sir. Q. And it caused you to jump back and strike that shelf? A. Yes, sir. Q. That is the girl that stood up a little while ago? A. Yes, sir.''

The testimony of plaintiff's witness, Viola Braihland, a woman employee of defendant working on the third floor of the building at the time of plaintiff's alleged injury, tended to corroborate the testimony of plaintiff respecting the congested condition of the south aisle or passageway, and the manner in which the cardboard cartons were piled in the aisle. Miss Braihland testified that ''there was always junk in there'' (the aisle); that the cartons or boxes ''were wobbly, because you never could go through there;'' and that the boxes were loosely packed or piled (the witness illustrating, in the

presence of the jury, the manner in which the cardboard boxes or cartons were piled in the aisle).

On behalf of defendant, the witness Elizabeth Urklene testified that she was working around the corner of the glass-enclosed dry room, and, consequently, she did not see what occurred in the aisle or passageway on the south side of the floor on the morning of plaintiff's alleged injury; that she heard a bump—"it was a bump just the same as if the packer was bumping stuff around"—and that plaintiff came around the corner of the dry room and said to witness, "Oh, I bumped my back." Witness did not hear any boxes fall, nor did she hear any vials or bottles break. Plaintiff said to witness at the time, "I hurt my back," and a few days thereafter plaintiff told witness that her (plaintiff's) back was festering, and witness advised plaintiff to "go to the doctor," which plaintiff afterward told witness she did.

Defendant's witness, Minnie Rush, testified that she was working on the same floor of the building at the time of plaintiff's alleged injury, but that she heard no boxes or cartons fall on the morning of July 6, 1923, and that she had never seen any such cartons fall from the piles at any time. She testified, however, that "there was a good deal of stuff" stored in the south aisle or passageway.

George Liebig was a packer employed by defendant at the time of plaintiff's alleged injury, and he testified on behalf of defendant that it was his duty to pile the cardboard cartons along the south side of the aisle or passageway referred to in the evidence; that usually the cartons were piled in two rows, but sometimes they were piled in three rows; that the rear row of cartons was always piled against the south wall of the passageway; that witness was always "very careful" in stacking or piling the cartons "to see that they were in line, straight up;" that, during the four years of his employment at such work, he had never heard of any of the boxes or cartons falling from the piles; that he frequently carried the cartons from the piles to the women employees upon the floor; that he usually carried eight cartons at a time, removing them from the tops of the piles; and that "every time I passed by, I always looked over and seen them; if I seen them out of order, I would straighten them up;" but witness further testified that he had never seen the rows or piles "out of order."

Defendant's superintendent, McFarland, testified that he had not heard of any of the boxes or cartons falling from the piles in July, 1923; that he had never seen "any protrusions, of any kind, of boxes there, or even any sloppy way of being stacked there," but that he had not looked at the piles with a view to ascertaining such matters—"no reason for me to do it." He testified further: "Q. How often would you say that you did that—that you looked at the

boxes for the purpose of satisfying yourself that they were all right? A. Every time I went back from the office to the work room, I always looked over everything as I would pass. I didn't stop and examine them, or shake them. Q. I understand that. A. Or replace it or anything, but I just simply gave general oversight of everything as I went by. Q. Now, in looking over things generally, as superintendent in charge there, did you ever direct your mind at any time, either on one occasion or more than one occasion, or every day or as many times as you went by, did you ever direct your mind in particular as to the manner in which they were stacked or piled at the particular time you would be passing; did you ever let your attention flow in that direction? A. Well, I can't say that I did exactly, because I never saw any necessity for burdening my mind; just simply go there and look at that pile of boxes.''

Plaintiff worked continuously in her employment from July 6, 1923, the date of her alleged injury, until January 28, 1924, when she ceased working. She testified that two or three days after her injury on July 6, 1923, she observed a bruise on her back, and her back became very sore and an open wound or abscess very shortly developed, which abscess continuously discharged pus; that the abscess or wound had never healed, and was still discharging pus at the time of the trial, in January, 1926; that, at one time, the opening of the abscess was as large as a silver quarter; that the condition got so bad that she was compelled to quit work on January 28, 1924, and to remain at home in the care of a sister; that she was thereafter confined to bed for a period of a month and a half, or two months; that she could not stoop or walk; that she has suffered continuously from headaches, backache, and nervousness; and that her hair had turned gray since her injury, and she had lost several pounds in weight.

Several physicians testified to having attended and treated plaintiff for her injury, one of the physicians having been called to attend her about the middle of July, 1923. The latter physician testified that, when he first saw plaintiff, she complained of pain over the lower part of the spine, and upon examination he found a swelling there, with redness and a slight abrasion of the skin in the region of the fourth lumbar vertebra; that in January, 1924, plaintiff's condition became worse, and the tissues showed signs of breaking down, forming an abscess in the back; that he diagnosed her injury as an injury to the bone and the periosteum, and that there had been a destruction of the bone, so that the nutrition of the bone had become impaired to the extent that the periosteum, or lining of the bone, was destroyed.

Another physician testified that he had attended plaintiff since February 26, 1924, and that his written record disclosed that he

had treated plaintiff 280 times up to January 8, 1926; that, when he first saw plaintiff, he found a reddened area in the region of the fifth lumbar vertebra, which area was very tender on pressure or manipulation, and which later developed into an open sore or abscess, which exuded considerable yellow pus; that the abscess had partially healed by granulation, although there was still a small opening in the wound in January, 1926.

Another physician made two examinations of plaintiff, one on April 17, 1925, and the other on January 8, 1926. He thus described plaintiff's condition in April, 1925: ''At that time, there was an old indurated scar, covering an area about the size of the palm of the hand, in the small of the back region; it extended out around in a circle; the scar tissues extended clear through all the structures of the skin and into the structures and down to the spinal column; in the center of this wound there was a sinus, or opening, which was discharging yellow pus; around this wound it was quite tender to the touch; the patient was very hypersensitive when it was touched or manipulated; there was evidence of wasting of the muscles; the muscles of the back were flattening out, they were losing their tone; there was also evidence of some stiffening in the vertebrae, or the back bone; that is, the back bone in that region didn't have its normal movements, as it should have, forward and backward, which indicated to my mind some change in the bony structure, some disease going on in the bones of the spinal column in that region; this we usually speak of as necrosis, or wasting or degeneration of bone, where the bone is being destroyed; a rotting of the bone.''

Examination of plaintiff was made, on January 13, 1926 (immediately before the trial of the present action), by a surgeon, who testified that he found a whitish, somewhat reddish, discoloration of a scar, about two and one-half inches in diameter, in the center of which there was a small opening from which there was some discharge exuding; that the scar was on the lower end of the spine, at the pelvis, opposite the region of the fifth lumbar vertebra; the scar was depressed, and was quite adherent to the bone, so that it could not be moved, or slid, normally across the bone; that he examined plaintiff's spine for motion, and found the lower part of the plaintiff's spine to be rigid; it would not bend either forward or backward; the spine ''seemed to be more or less fixed in that region;'' there was also limitation in the lateral bending, or twisting, of the spine, but witness found no signs of injury to the spinal cord itself.

The several physicians diagnosed plaintiff's injury as a necrosis of the spinal vertebrae, and expressed the opinion that such injury was the result of a trauma, and could have been caused by striking her back upon a sharp, square corner of the shelf or bracket referred

to in the evidence. The several physicians also expressed the opinion that plaintiff's injury is permanent.

It appears from the record herein that, during the course of the trial, the plaintiff, the attorneys, the trial judge, and the jury retired to the judge's chambers, where plaintiff exposed her back and her injury to the ocular view of the jury. While appellant refers to this incident of the trial as being provocative of a grossly excessive verdict of the jury, the record does not show that any objection was interposed at the time by the defendant, or its counsel, to the exhibition of plaintiff's injury to the jury. On the contrary, the record before us rather indicates that defendant's counsel acquiesced in the exhibition of plaintiff's injury to the view of the jury.

Error is assigned by appellant in the refusal, by the trial court, of defendant's peremptory instruction, in the nature of a demurrer to the evidence, requested at the close of all the evidence; in the giving to the jury of plaintiff's instruction, numbered one, which presented plaintiff's theory of recovery, and which directed a verdict thereon; and because the verdict is so grossly excessive in amount as to indicate that the verdict was the result of passion and prejudice on the part of the jury, and thereby to entitle defendant to another trial of plaintiff's action.

I. Appellant urges that plaintiff's own testimony convicts her of contributory negligence as a matter of law, and, hence, that error was committed by the trial court in refusing defendant's peremptory instruction, in the nature of a demurrer to the evidence, requested at the close of all the evidence. It is the contention of appellant that the danger of the protruding shelf or bracket, and of a cardboard carton, or cartons, falling from the piles or rows of cartons, stacked on the south side of the south aisle or passageway on the third floor of appellant's building, was so imminent, threatening, open, obvious and glaring, according to plaintiff's own testimony, that she was guilty of contributory negligence as a matter of law in entering and using the passageway in the performance of her work and duties. It has been uniformly held, however, by this court, in a long line of decisions, that mere knowledge of the danger of the place of work, or of the appliance or instrumentality, on the part of a servant, will not defeat an action for personal injuries suffered by the servant unless the danger was so glaring, open and obvious as to threaten immediate and almost certain injury. [Jewell v. Bolt & Nut Co., 231 Mo. 176, 201, and cases cited; Compton v. Construction Co., 315 Mo. 1068, 1087.] And the jurisprudence of this State abounds with cases wherein the plaintiff servant knew the danger, and so testified, yet was permitted to recover for an injury. [Conroy v. Iron Works,

62. Mo. 35, 39; Burkard v. Rope Co., 217 Mo. 466, 481; Buckner v. Horse & Mule Co., 221 Mo. 700; Jewell v. Bolt & Nut Co., 231 Mo. 176, 201; Edmondson v. Hotels Statler Co., 306 Mo. 216, 231.] The Edmondson case, supra, is typical of the holdings of this court upon the question raised by the appellant herein. In that case, the plaintiff, a pantry-woman in the employ of defendant Hotels Company, was injured by stepping or slipping into a hole in a wooden grating laid over a drain in the concrete floor of the pantry-room. She testified quite positively that some weeks previous to her injury she had observed the holes in the wooden grating and had caught her foot in one of them, and that it was her purpose to avoid the holes by stepping around or over the grating. In denying appellant's claim of error that the demurrer to the evidence should have been sustained on the ground of plaintiff's contributory negligence as a matter of law, we said (306 Mo. l. c. 231, 232): "The grating in the fruit pantry was not so 'glaringly dangerous,' within the rule as established in this State, that the court would have been justified in declaring respondent's contributory negligence to be conclusively established. The question as to contributory negligence is usually for the jury, and it was so in this case. . . . She (plaintiff) was not, in the circumstances, obliged to give up her employment or forfeit all right of recovery in case of injury in any way. What she did at the time her foot slipped into the hole in the grating and caused her to fall does not so conclusively appear to have been negligent as to exclude a legitimate inference by the jury to the contrary. The trial court was right in holding that question to be one for the jury's decision."

We are unable to say, as a matter of law, that plaintiff's own testimony conclusively establishes the fact that the danger of the protruding shelf, and of a carton, or cartons, falling from the piles in the passageway, was so glaring, open and obvious as to threaten immediate and almost certain injury or mishap to plaintiff. Besides, we think that plaintiff is entitled to the benefit of defendant's evidence, which rather tended to aid plaintiff's case, to the effect that cartons had never been seen or heard to fall from the piles in the passageway prior to plaintiff's alleged injury. If defendant's evidence was to be believed by the jury, certainly it cannot well be said that the danger of the cartons falling from the piles was so glaring, open and obvious as to threaten imminent and almost certain mishap to plaintiff.

A suggestion is made by appellant in its brief that, according to plaintiff's testimony, she had instructions from the defendant master that, "if anything didn't seem to be reasonably safe for the girls," plaintiff, as forewoman, was to tell the defendant, or its superintendent and general foreman, McFarland, thereof, and yet plaintiff "said never a word to Mr. McFar-

land" about the unstable and disorderly condition of the piles of cardboard cartons or boxes stacked and stored in the south aisle or passageway on the third floor of defendant's building; hence, it seems to be suggested by appellant that plaintiff's failure to tell, or to notify, the defendant's superintendent, McFarland, of the unstable and disorderly condition of the piles of cardboard cartons was the proximate cause of plaintiff's injury. The superintendent, McFarland, testified, however, that he saw the piles of cartons from day to day in making his rounds of the floor, and therefore his opportunities of knowing of the condition of the piles of cartons were at least equal, if not superior, to the opportunities and knowledge of plaintiff. It was unnecessary that plaintiff should tell or notify defendant's vice-principal of a situation or condition which he could see and observe himself.

Consequently, plaintiff's failure to notify defendant's vice-principal, McFarland, of the condition of the piles of cartons was an immaterial factor in the situation, and therefore was not the efficient and producing cause of her injury; and, furthermore, it was the non-delegable duty of defendant, and of its vice-principal, McFarland, we think, to use reasonable care, by proper inspection, to ascertain whether the cartons were securely and orderly packed or piled in the passageway. [Dickson v. Railroad Co., 124 Mo. 140, 149, 152; Peterson v. Railways Co., 270 Mo. 67, 75; Hires v. Grocery Co. (Mo. Sup.), 296 S. W. 408, 411.]

Appellant urges, as another reason why the demurrer to the evidence should have been sustained, that (quoting from appellant's brief) "there was no causal connection shown by the evidence from which it could be determined how, or why, the box fell, if it did fall." If we rightly appreciate and comprehend appellant's contention, it seems to be that there is no substantial evidence herein tending to show what caused the carton, or cartons, to fall from the piles, and therefore plaintiff failed by her proof to remove her cause out of the realm of mere speculation and conjecture, and failed to make a prima-facie case of actionable negligence on the part of defendant. Plaintiff testified quite positively, however, that two or three cartons did fall from the top of the pile, or piles, of cartons, and that one of the cartons in falling struck her on the shoulder; that the piles were shaky, "wobbly and waggly;" and that the cartons were stacked and piled "disorderly; they were put in kind of mussed." Plaintiff was corroborated in her testimony by the witness, Viola Braihland, who testified that the cartons, or cardboard boxes, "were wobbly, because you never could go through there," and that the cartons or boxes were loosely packed or piled. Both plaintiff and the witness, Miss Braihland, according to the record before us, demonstrated,

before the view of the jury, the manner in which the cartons were stacked or piled in the passageway, apparently using in such demonstration similar cardboard cartons supplied for such purpose at the trial of the action. Of course, the printed record herein does not show with clearness the manner and scope of such demonstration, but it is clear from the record that the jury herein had the benefit of the demonstration, which was seemingly acquiesced in by counsel for the respective parties.

While it is true, as urged by appellant, that, in actions for recovery of damages arising out of negligence, the plaintiff is bound to prove, not only that defendant was *negligent* in the respect charged by plaintiff, but that *such negligence* was the direct, immediate and proximate *cause* of plaintiff's injury and damage, and that such *causal connection* must be proved by substantial evidence, and not be left to mere speculation and conjecture. However, the rule of evidence does not require that there must be *direct* (as distinguished from *inferential*) proof of the fact itself, but it is sufficient if the facts and circumstances proved are of such a nature, and are so connected and related to each other, that the conclusion of causal connection therefrom may be fairly and logically inferred; in other words, causal connection may be shown by proof of such facts as logically create the inference that the negligence proved proximately caused or contributed to the injury. [Settle v. Railroad Co., 127 Mo. 336, 341; Dakan v. Mercantile Co., 197 Mo. 238, 254; Harper v. Terminal Co., 187 Mo. 575, 586; Jaquith v. Plumb (Mo. Sup.), 254 S. W. 89, 91; Oglesby v. Railway Co. (Mo. Sup.), 1 S. W. (2d) 172, 178.] We deem the facts and circumstances in evidence sufficient to establish a causal connection between the negligence of defendant, as charged, and plaintiff's injury.

We are of the opinion that the trial court rightly refused the peremptory instruction, in the nature of a demurrer to the evidence, requested by defendant at the close of all the evidence.

II. Error is assigned in the giving of plaintiff's instruction numbered one, which reads: "The court instructs the jury that if you find and believe from the evidence that plaintiff while in the employ of defendant on the 6th day of July, 1923, struck her back against the shelf mentioned in evidence and was injured thereby; and if you further find and believe from the evidence that at and prior to the time of said injury, if you so find, the plaintiff's place of work was unsafe and dangerous and not reasonably safe in that the boxes mentioned in evidence were piled indiscriminately and in disorder and were not adequately arranged, secured or fastened so as to prevent their falling and that by reason thereof the boxes were likely to fall and cause injuries;

and if you further find and believe from the evidence that in thus furnishing and providing said place of work, if you find the plaintiff was provided with said place to work, the defendant failed to exercise ordinary care and was guilty of negligence; and if you further find and believe from the evidence that on the occasion in question plaintiff was near the shelf mentioned in evidence and that one of the boxes piled as aforesaid, if you do so find, did fall and strike plaintiff and as a result thereof, if you so find, plaintiff came in contact with the shelf mentioned in evidence; and if you further find that plaintiff was exercising ordinary care for her own safety, if you do so find, and was injured in the manner aforesaid by reason of the negligence of the defendant (if you find from the evidence that the defendant was guilty of negligence in failing to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work in the sense that said boxes were indiscriminately piled and in disorder and without securing or fastening the same) then your verdict must be in favor of the plaintiff and against the defendant.''

It is claimed by appellant that the wording, or the grammatical arrangement and construction, of such instruction is involved, misleading, confusing and unintelligible. While, perhaps, the grammatical arrangement and construction of the instruction might be better, yet we believe the sense and meaning of the instruction was intelligible and clear to the jury, and that the jury could not have been misled or confused by the form or arrangement of the instruction. The instruction, in our opinion, was well within the scope of both the pleadings and the evidence.

The most serious complaint urged by appellant against the instruction is that it fails to require the jury to find that the defendant knew, or by the exercise of ordinary care could have known, of the unsafe condition of plaintiff's place of work. The instruction, however, requires the jury to find, as a necessary prerequisite to a verdict in favor of plaintiff, that, ''*in thus furnishing and providing said place of work, . . . the defendant failed to use ordinary care and was guilty of negligence.*'' It has been repeatedly and consistently ruled by this court that a finding of *negligence* imports knowledge (on the part of the party found to have been negligent) of the unsafe condition of the appliance, or of the place of work. An allegation, or a finding, that a defendant *negligently* caused or permitted an unsafe described condition is equivalent to an allegation, or a finding, that the defendant *knew* the condition to exist. [Hall v. Railway Co., 74 Mo. 298, 302; Johnson v. Railway Co., 96 Mo. 340, 345; Crane v. Railway Co., 87 Mo. 588, 594; Morton v. Construction Co.,

924

280 Mo. 360, 380; Midway National Bank & Trust Co. v. Davis, 288 Mo. 563, 575; Berberet v. Amusement Co. (Mo. Sup.), 3 S. W. (2d) 1025, 1027; Peters v. Hooven and Allison Co. (Mo. App.), 281 S. W. 72, 74.] The reason for the foregoing uniform holding is readily apparent, for it is obvious that the jury could not well have found that the defendant was *negligent* in furnishing the plaintiff with an unsafe place in which to work without believing (and inferentially finding) that defendant *knew,* or by the exercise of ordinary care could have known, of the unsafe condition of the place of work.

Appellant, in support of its contention, leans strongly upon the decision of this court, en banc, in State ex rel. Long v. Ellison, 272 Mo. 571, an original proceeding in certiorari wherein this court quashed the record of the Kansas City Court of Appeals in a negligence case ruled by said Court of Appeals. The Court of Appeals, in such negligence case, ruled an instruction, given on behalf of plaintiff therein, and which undertook to cover the whole case and directed a verdict, was erroneous and defective for the reason that it permitted the jury to find for plaintiff without finding that the hypothetical facts stated in such instruction, if true, would constitute negligence on the part of the defendant. The Court of Appeals, however, held that the error found in the instruction was cured by other instructions given for defendant in the cause. In the certiorari proceeding, this court held the latter holding of the Court of Appeals to be in conflict with certain controlling decisions of this court, to the effect that an instruction for plaintiff, purporting to cover the whole case and directing a verdict, cannot be cured by other instructions given for defendant. We expressly said, however, in our majority opinion therein, that *"it is not necessary for us to find that there is such defect in the instruction.* The Court of Appeals says there is such defect, and violates our rule when it says it was cured.'' Two of our Judges dissented to the majority opinion, one of said Judges expressing his dissent on the ground that the conflict of opinion (upon which we quashed the record of the Court of Appeals) ''would warrant quashing the record *only* in case the instruction is *in fact* erroneous. *I do not think it is.''* Hence, it is apparent that this court in the certiorari proceeding refused to pass on, and decide, whether the criticised instruction was *in fact* erroneous, and whether the Court of Appeals was right or wrong in so holding, and that we bottomed our decision wholly and solely upon the ruling of the Court of Appeals that the error (found by the Court of Appeals) in plaintiff's instruction was cured by other instructions given for defendant, which latter ruling we held to be in conflict with our own controlling decisions. In the instant cause, however, the instruction of plaintiff (criticised by appellant herein) submits the question of defendant's negligence under the hypo-

thesized facts and circumstances as one of fact to the jury, and requires the finding of the jury that defendant was negligent under the hypothesized premises, as a necessary prerequisite to a verdict in favor of plaintiff.

Appellant also cites, in support of its contention, several decisions wherein the plaintiff servant was injured by reason of some hidden, concealed or latent defect in an appliance or place of work, which defect was incapable of discovery by the defendant master upon a reasonable inspection, or wherein the unsafe condition of the appliance or place of work was so recent that the master had no opportunity to discover the same. Such decisions are inapplicable to the present case, for the evidence herein tends to show that the condition of plaintiff's place of work was patent to the defendant master, and such condition was not so recent as not to have been discoverable by defendant prior to plaintiff's injury.

A further criticism urged by appellant against plaintiff's said instruction is that it wholly fails to require the jury to find that the carton or box (which plaintiff claims to have fallen and struck her) fell from the pile of cartons or boxes because of the *manner* in which they were piled in the passageway. In other words, the complaint made against the instruction appears to be that the instruction fails and omits to require a finding by the jury of the causal connection between the alleged negligence of defendant and plaintiff's injury. This complaint or criticism involves an examination of the wording of the instruction. The instruction clearly required the jury to find, as necessary prerequisites to a verdict in favor of plaintiff, that the plaintiff's place of work, furnished and provided by defendant, was unsafe, dangerous and not reasonably safe in that the boxes were piled indiscriminately and in disorder, and were not adequately arranged, secured or fastened so as to prevent their falling (i. e., that plaintiff's working-place was unsafe and dangerous by reason of the *manner* in which the boxes were piled), and that, *"by reason thereof,"* the boxes were likely to fall and cause injury; that, in thus (so) furnishing and providing plaintiff with said place of work, defendant failed to exercise ordinary care and was guilty of negligence; that one of the boxes *"piled as aforesaid"* did fall and strike plaintiff, and that, *"as a result thereof,"* plaintiff was injured by coming in contact with the shelf mentioned in evidence; and that plaintiff was injured *"in the manner aforesaid"* by reason of defendant's negligence *"in failing to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work *in the sense that said boxes were indiscriminately piled and in disorder and without securing or fastening the same."* We think that the instruction clearly required the jury to find a causal connection between

the falling of the box and the manner in which the boxes were piled in the passageway, and also to find a causal connection between the alleged negligence of defendant and plaintiff's injury. [Cento v. American Fruit Growers (Mo. App.), 7 S. W. (2d) 304, 306; Reed v. Coal and Mining Co. (Mo. App.), 287 S. W. 852; Dyrcz v. Packing Co. (Mo. App.), 194 S. W. 761, 765.] The instruction in the instant case is quite materially different from the instruction deemed by this court to have been erroneous in the case of Dunsmore v. Hartmann (Mo. Sup.), 256 S. W. 1031, cited and relied upon by the appellant herein. The plaintiff in the Dunsmore case was injured by being thrown to the ground by the falling or slipping of a ladder upon which he was descending from the roof of a building upon which he was employed as a carpenter, and, while plaintiff's instruction submitted to the finding of the jury whether defendant's foreman had detached the wooden cleats which had held the ladder securely in place and whether it was negligence for the foreman to do so, the instruction did not require the jury to find that the removal of the wooden cleats rendered the ladder not reasonably safe, and that, as the result of removing the cleats, the ladder gave way when plaintiff stepped upon it, but merely required the jury to find that the plaintiff stepped upon the ladder and that it gave way. We are of opinion that the requirement of a finding of causal connection, obviously omitted from the instruction in the Dunsmore case, was present in plaintiff's instruction in the instant case, and that such question of causal connection was clearly submitted for a finding of the jury by the plaintiff's instruction herein.

We find no reversible error in the giving of plaintiff's instruction numbered one, and the assignment of error must be denied.

III. Lastly, appellant urges that the verdict of the jury, when viewed in the light of all the evidence respecting the nature and extent of plaintiff's injuries, her age and earnings at the time of injury, and coupled with the fact that plaintiff was permitted to retire to the judge's chambers and there exhibit her injury to the ocular view of the jury, is so grossly excessive as to conclusively show that the verdict was the result of passion and prejudice on the part of the jury. It would be only supererogation to again review in this opinion the medical and lay testimony bearing upon the nature, extent and permanency of plaintiff's injury, for we have set forth the substance of such testimony at some length in our statement of the facts. The evidence shows, however, that plaintiff was thirty-five years of age at the time of her injury, and was earning $15 per week at that time, or $780 per year. Plaintiff testified, on cross-examination, that she had always been a delicate woman, and that she "had never been very healthy at any time." We are not inclined to give weight or consideration to the fact that plaintiff was

permitted to exhibit her injury to the view of the jury, insamuch as no objections were made to such exhibition by defendant's counsel, and such exhibition was seemingly acquiesced in by defendant's counsel. We are unable to say, upon the record before us, that the verdict of the jury was the result of bias, passion or prejudice on the part of the jury. The evidence shows that plaintiff was attended by several physicians between July 6, 1923, the date of her injury, and January 14, 1926, the date of the trial of this action. One of the attending physicians testified that he alone had made 280 professional calls, or visits, upon plaintiff, and that his charge, or fee, for each such visit is three dollars, making an aggregate charge of $840 for the professional visits made by this physician alone. The evidence further tends to show that plaintiff had suffered a loss of earnings of not less than $1500 at the time of trial. The medical testimony indicates that plaintiff's injury is a necrosis of the spinal vertebrae, or, as one of the physicians described the injury, "a wasting or degeneration of bone; a rotting of the bone;" and that the injury has resulted in rigidity of the spine, and in loss of the normal movement, forward and backward, and laterally, of the spinal vertebrae. The physicians expressed the opinion that plaintiff's injury is a permanent one. There was no medical testimony proffered by defendant to controvert the testimony of the several physicians who treated or examined plaintiff's injury. The record discloses that the trial judge was afforded an ocular view of her injury, and had the opportunity to observe the manner and demeanor of the witnesses, both lay and professional, while testifying as to the nature, extent and permanency of her injuries. The trial court ordered $7000 to be remitted from the verdict, and upon such *remittitur* being made and entered by plaintiff, the court entered a judgment in the sum of $18,000, thereby denoting the trial court's judgment respecting the pecuniary measure of plaintiff's damages. Under such circumstances, and in view of all the evidence herein, we are unwilling to say that the amount of the judgment is excessive. The amount of the judgment is not out of line with pecuniary awards, or allowances, by way of compensatory damages for somewhat similar injuries, which have been permitted to stand by this court in other cases. [Taylor v. Railroad Co., 311 Mo. 604; Stein v. Rainey, 315 Mo. 535; Brickell v. Fleming (Mo. Sup.), 281 S. W. 951.]

No reversible error being found herein, the judgment *nisi* must be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.