Adolph Johnson v. Chicago & Eastern Illinois Railway Company, a Corporation, Appellant.—64 S. W. (2d) 674.

Division Two, October 28, 1933.

*Jones, Hocker, Sullivan & Gladney* and *Vincent L. Boisaubin* for appellant.

*Eagleton, Henwood & Waechter* and *Allen, Moser & Marsalek* for respondent.

COOLEY, C.—Action for personal injuries under the Federal Employers' Liability Act. Plaintiff obtained a verdict for $30,000, of which the trial court required him to remit $10,000. Judgment was duly entered for plaintiff for $20,000 and defendant appealed. Plaintiff and defendant were both engaged in interstate commerce and the action was properly brought under the above mentioned act. Plaintiff was an extra switchman, employed by defendant in its yards at Danville, Illinois. He was injured about seven-thirty A. M.,

March 9, 1928, while attempting to step upon the front footboard of an approaching switch engine by reason of coming in contact with John Hoctor, conductor of the switching crew, who was on the footboard and who, plaintiff claims, negligently moved over into his path just as he was in the act of boarding the engine, causing him to be thrown from and run over by the engine. His left leg was crushed, necessitating its amputation about ten inches below the knee. Defendant's answer pleaded that plaintiff's injury "resulted from his failure to use ordinary care for his own safety," in that he negligently stepped onto the track between the rails in front of the approaching engine and attempted to board the front footboard from that position, and that he negligently violated a rule of defendant company forbidding switchmen and other employees "to step upon the front of approaching engines; which acts of failure to exercise ordinary care on the part of plaintiff directly caused or contributed to cause, plaintiff's injuries." The answer also pleaded assumption of risk by plaintiff. By reply plaintiff denied the existence of the rule pleaded by defendant and further alleged that if there was or had been such rule it had never been enforced but had been habitually disregarded with defendant's knowledge and consent and had been abandoned "by such habitual nonobservance." Appellant's insistence that its demurrer to the evidence should have been sustained requires a somewhat detailed statement of the evidence.

The switching crew of which plaintiff was a member consisted of himself who was "field man," one Mayfield, head brakeman, Hoctor, conductor and in charge of the crew, and the engineer and fireman. At the time of the accident there were no cars attached to the engine. It had backed northward past a certain switch in order to get on a switch track called the belt upon which switching work was to be done. As it moved northward Mayfield, Hoctor and plaintiff rode on the front (south) footboard of the engine. There was room, about two and a half or three feet, for two men standing close together, on each side of the drawbar of the engine which projected beyond the footboard. Mayfield rode on the engineer's side and Hoctor and plaintiff on the fireman's side, plaintiff on the inside next the drawbar and Hoctor on the outside at the end of the footboard. The engineer's side of the engine is called in the evidence the right side and the fireman's side the left side. We shall so refer to them. As the engine passed the yard office going north Hoctor and plaintiff alighted. Hoctor entered the office to get his switching orders and plaintiff, at Hoctor's direction, walked southward to a switch stand to "line" (throw) a certain switch. The engine, with Mayfield still on the footboard, moved on northward past the first mentioned switch which was then thrown by Mayfield so as to send the engine onto the belt track. The engine then moved southward, Mayfield resuming his former position on the footboard.

Plaintiff testified that as the engine had moved northward Mayfield rode on the extreme right end of the footboard and after throwing the switch to allow the engine to come south for the belt track, resumed the same position. He did not notice whether Mayfield later moved over nearer the drawbar. Mayfield, for defendant, testified that after throwing the switch and getting back on the footboard he signaled the engineer to move forward and "moved over to the drawbar to give Mr. Johnson a chance to get on my side." According to plaintiff's testimony when Hoctor emerged from the yard office he directed plaintiff to relign the switch which, at Hoctor's direction, he had first ligned for another track. Plaintiff did so and then stepped on the track between the rails to await and board the engine as it came south. As the engine came south Hoctor got on, the engine being in motion, and resumed his original position at the left end of the footboard, leaving vacant the space on the left side of and next to the drawbar where plaintiff had previously ridden. At the time Hoctor got on plaintiff was fifty or sixty feet to the south, standing between the rails, somewhat nearer the east than the west rail, waiting to resume his place on the footboard and thus remained until the engine reached him. The engine continued southward toward him, moving at a speed of two or three miles an hour. When it reached him he attempted to board it and as he was in the act of doing so Hoctor suddenly and without warning moved over toward the drawbar into the space plaintiff was intending and attempting to occupy. Plaintiff thus described what occurred: "As I was standing on the right foot, with my left foot raised, making the step, and was in the act of going down with my left foot (to place it on the footboard) I collided with John Hoctor by his moving over in my way," toward the drawbar and into the place where plaintiff was attempting to board, as he further explained. Hoctor's unexpected movement caused plaintiff to lose his hold and his balance and to fall with his leg across the rail. Before he could extricate himself his leg was crushed. He testified that while the engine was coming toward him after Hoctor got on the latter was facing south, toward him, apparently reading his switching list. He had the list in his hands. Plaintiff said Hoctor could have seen him but did not say that Hoctor did in fact see him.

"Q. He wasn't watching for you? A. No, sir; he wasn't watching for me.

"Q. You say you were standing and, as you raised your foot and Mr. Hoctor was still reading his switch list, he stepped over to the center? A. Yes, sir, he stepped over as I was getting on.

"Q. He was still reading his switch lists? A. When I judged the footboard I wasn't looking into his face."

On this point Hoctor, for defendant, testified on cross-examination that when he was just about to get on the footboard or had

just gotten on—he said once, "I was on the footboard,"—he saw plaintiff who was then standing at the switch facing the engine and outside the rails on the west side or right side of the track and that the engine was then within ten or twelve feet of plaintiff. That was the last time he saw plaintiff until the latter collided with him. He testified he had read his switch lists as he came out of the yard office and at the time plaintiff attempted to get on the footboard had the lists in his pocket. On direct examination he testified: "When I got on I turned around and just about that time Johnson stepped on my left leg and foot. I was in the act of turning around. I was facing the engine and had started to turn around and he stepped up in here (indicating) and kind of grabbed me." The engine was moving south.

"Q. When you got on the engine were you facing the engine or facing south? A. I was facing south."

Relative to the customary manner of boarding switch engines in defendant's yards, plaintiff testified in substance that he had been in defendant's employ at and about the yards for more than ten years, first as yard clerk and from November, 1926, to the time of his injury continuously, as switchman and was familiar with the custom and practice; that the rule forbidding switchmen stepping upon the front end of approaching switch engines had never been observed nor had defendant ever attempted to enforce it; that it had been and was customary for all employees in the switching service to get on the front end when the engine was moving; that it was necessary so to do in order not to slow up the work; the switch crew "always ride the footboard the way the engine is in motion," that is, if headed south they board and ride the south end; "If you got work to do in front, you board the front end of the engine." The work to be done in this instance was on the belt line to the south, that is, to the front of the engine as it was then moving. There were two more switches to be thrown, both on the right side of the track, before the engine could reach the cars to be moved. It was the duty of both plaintiff and Mayfield to throw the switches. Plaintiff further testified, relative to the nonenforcement of the rule pleaded by defendant, that on one occasion defendant's yardmaster, who was "over all the crews and persons in the yard," had in effect reprimanded him for requiring engines to "almost come to a complete stop" before he would get on, thus slowing up the work. Defendant offered no evidence tending to contradict that of plaintiff relative to the custom and practice of boarding the front end of moving engines or tending to show any enforcement of or attempt to enforce the rule pleaded by it.

Hoctor, defendant's witness, testified that a field switchman, such as plaintiff, did not have a particular side of the footboard upon which to ride; that plaintiff usually rode on one side of the drawbar

and Mayfield on the other; that he (witness) regularly rode the front end, to be in position to signal the fireman or engineer.

"Q. In addition to you riding there yourself, you required other members of your crew to ride there regularly? A. Regularly; one on either side of the drawbar.

"Q. Johnson was to ride on one side of the drawbar and Mayfield on the other? A. Yes, sir.

"Q. You usually have a man close to you to tell him what you are doing and what to couple up and so on? A. Yes, sir."

I. The negligence on the part of defendant charged and relied upon by plaintiff is that of defendant's employee, Hoctor. Appellant insists that its demurrer to the evidence should have been sustained because it conclusively appears that Hoctor was not guilty of any negligence; that plaintiff's own negligence was the sole proximate cause of his injury; and that plaintiff assumed the risk, and therefore cannot recover. These contentions will be considered together.

■ As defendant did not stand upon its demurrer at the close of plaintiff's case in chief but offered evidence, the submissibility of the case is to be determined by consideration of all the evidence in plaintiff's favor regardless of which side offered it. On demurrer the plaintiff is entitled to have taken as true all evidence tending to support his case and is to be given the benefit of all inferences in his favor that may reasonably be drawn from the facts such evidence tends to prove. And the court, in ruling a demurrer, is not at liberty to draw inferences of fact favorable to the defendant to negative facts which plaintiff's evidence tends to prove or to overthrow presumptions of law or inferences of fact in favor of the plaintiff. These rules are well established. [See Buesching v. St. Louis Gas Light Co., 73 Mo. 219; Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 609, 20 S. W. (2d) 509, 511, and cases cited.]

■ ■ The evidence thus considered, it was shown in this case to be the custom and practice, long established and regularly followed with defendant's knowledge and consent, for switchmen to board the front end of slowly moving switch engines. Hoctor must be presumed to have known such custom. Appellant argues that it was not shown to have been the custom to go *between the rails* for the purpose of boarding. The rule invoked by defendant forbids switchmen "to step upon the front of approaching engines." The evidence offered to show habitual nonobservance of the rule was couched in substantially the same language as the rule itself. There was nothing in the plaintiff's evidence to indicate that in speaking of the custom of boarding the front footboard he meant from the side rather than from between the rails. The plain inference from his whole testimony is that he meant boarding from between the rails as he had attempted to do. Defendant made no effort to dispute that testimony thus construed or to show that such was not the custom.

Under the circumstances if the rule meant stepping upon the front end from between the rails the evidence, couched in similar language, offered to show its nonobservance may be given the same construction. In any event the jury may well have found under the evidence that it was the custom to board from between the rails as plaintiff attempted to do.

█ Hoctor's testimony tends to show that where two switchmen were working it was customary for one of them to ride on each side of the drawbar. He said he regularly required them so to ride. On this occasion they had originally taken such positions and occupied them as the engine had moved northward. When it started south after Mayfield threw the first switch the latter resumed his original position to the right of the drawbar. When Hoctor got on he at first resumed his original position on the extreme left end of the footboard, leaving vacant the space on the left of and next the drawbar where plaintiff had previously ridden, and where, according to Hoctor's testimony, he was required to ride—the place which under any construction of the evidence he might have been expected to resume. He did not observe Mayfield move over toward the drawbar on the right side. But if Mayfield did so still Hoctor, if, as he testified, he regularly required Mayfield and plaintiff to ride one on each side of the drawbar, should have anticipated that plaintiff would, or at least might, attempt to resume his former position on the left side. According to plaintiff's testimony he was standing between the rails, nearer the east (left) than the west rail, indicating that he meant to board from that position, when Hoctor got on the footboard and while the engine traversed the intervening fifty or sixty feet toward plaintiff. There was ample light. Hoctor was facing plaintiff, knew he had gone to throw the switch and would board the front end of the engine when it reached him and he had but to glance forward in order to see him so waiting, if in fact he did not see him. And there was evidence to warrant a finding by the jury that Hoctor did see plaintiff in that position. Hoctor testified that he saw plaintiff as he, Hoctor, was getting on or immediately after he got on the footboard. He said that plaintiff was then standing at the switch, west of and outside the rails, and that the engine was then only ten or twelve feet from plaintiff. According to plaintiff's testimony, however, when Hoctor got on he, plaintiff, was standing between the rails and so remained until the engine reached him. The jury may have believed Hoctor's statement that as he was getting on he saw plaintiff awaiting the engine's approach and may have disbelieved his statement that plaintiff was then outside the rails, crediting instead plaintiff's testimony that he was then between the rails. The jury may believe part only of a witness's testimony, rejecting as untrue other portions. Under the evidence it is unquestionably clear the court could not say as a matter of law that

Hoctor was guiltless of negligence in moving over suddenly and without warning into plaintiff's path as the latter was in the act of attempting to get on the footboard. ■ If plaintiff himself was negligent in going between the rails to board the engine such negligence was at most contributory negligence which under the applicable law does not bar recovery.

■ On the question of defendant's negligence and also that of assumption of risk Shaw v. Chicago & Alton Railroad Co., 314 Mo. 123, 282 S. W. 416, is in point. The facts are substantially analogous. In that case the deceased, Shaw, and one Whitworth were fellow switchmen. They customarily rode on the front footboard of the engine, both riding on the same side of the drawbar. It was the custom for switchmen to board moving engines from between the rails. Shaw and Whitworth had both alighted to throw switches. Whitworth got back on the footboard first. It was the rule for the first man on to move over to the drawbar and leave the outside end open for the next man. This Whitworth failed to do, and Shaw stepped between the rails to get on next to the drawbar. Whitworth was facing him, and saw, or could have seen him. As Shaw attempted to get on Whitworth moved toward the drawbar and in so doing struck Shaw and caused him to fall under the engine. This court rightly held that Whitworth was negligent ''in suddenly changing his position, when he saw, or could have seen deceased attempting to board the engine from the space in the middle of the track, before said Whitworth changed his position.'' Relative to assumption of risk the court well said:

''We can give the Federal case law upon the subject the most extreme exposition to which some cases go, and yet it will not affect this case. The death of Shaw was occasioned by the negligent act of Whitworth, and not by the fact that he was within the two rails of the track. Nor need we discuss the fact that the proven custom of that yard was for brakemen to get upon this step while standing between the two rails upon which the engine was approaching. Shaw did not assume the negligent act of Whitworth, of which he had no knowledge, or means of knowledge, until the fatal and negligent act was done, and Shaw under the wheels of the engine. The plea of assumption of risks must fail.'' [314 Mo. l. c. 139, 282 S. W. l. c. 421.]

In the instant case as in the Shaw case plaintiff's injury was proximately caused by the negligent act of another employee of defendant, for whose negligence defendant is liable, and not by the fact that he went between the rails. But for Hoctor's negligent act in suddenly moving into his path he would not have been injured. Under the Federal Act an employee does not assume an unknown risk occasioned by the negligent act of a fellow servant which he could not have foreseen or expected. [Shaw case, supra; Reed v.

Director General of Railroads, 258 U. S. 92; Ches. & O. Ry. Co. v. De Atley, 241 U. S. 310, 314-15; Ches. & O. Ry. Co. v. Proffitt, 241 U. S. 462, 469.]

Appellant further argues that plaintiff knowingly chose a dangerous way to board the engine, viz., from between the rails, when he could have remained outside the rails and boarded the right end of the footboard. We have pointed out that there was evidence from which the jury could have found that he was attempting to board in the customary manner and at the place on the footboard where he was supposed to ride. It was not particularly dangerous to get on in that way except as it was made so in this instance by Hoctor's unexpected and not-to-be-foreseen negligent act. Plaintiff's injury did not result from any danger ordinarily inhering in boarding from between the rails, but from Hoctor's act, with foreknowledge of which plaintiff cannot be charged. The rule barring recovery where one chooses a dangerous way when he might adopt a safe way has no application here. The demurrer to the evidence was properly overruled.

II. Appellant challenges the correctness of plaintiff's Instruction No. 1, the only one given at plaintiff's request, because (a) it does not expressly require the jury to find that Hoctor knew or should have known that plaintiff was in a position of peril and about to step upon the left side of the footboard when he, Hoctor, moved into plaintiff's path, and (b) that it purports to cover the case and ignores the pleaded issue of contributory negligence.

(a) The instruction, hypothesizing other facts necessary to be found and which the evidence tended to show, directs a verdict for plaintiff if the jury finds that it was plaintiff's duty to board the engine while moving and that while he was in the act of thus boarding the engine ''another servant of the defendant, who was riding upon said engine near the place where plaintiff was attempting to board the same, did move into the path of the plaintiff'' and thereby interfered with his boarding the engine and as a direct result thereof plaintiff was thrown from the engine and injured, and further, that said other servant ''in thus moving into the path of the plaintiff, if you do so find, and interfering with plaintiff boarding said engine, if you do so find, *did fail to exercise ordinary care and was then and there guilty of negligence,*'' and that the plaintiff was injured as a direct and proximate result of such negligence, if the jury found it to be negligence. (Italics ours.) On this point appellant cites two cases, Chapman v. K. C. Ry. Co., 217 S. W. 290, by Division One of this court, and Hanks v. St. L. & S. F. Ry. Co., 217 Mo. App. 528, 269 S. W. 404. The latter case presents a different situation in its facts. It may be doubted whether it is sufficiently analogous to the instant case to constitute a precedent for this case. The former

is more nearly similar. In that case the plaintiff was on the step of a slowly moving street car, intending to alight at a place where passengers sometimes boarded or alighted from the car while it was moving slowly. He relied upon an alleged custom of the defendant not to start a car which had stopped or slowed down to admit or discharge passengers until the motorman was given a ''go ahead'' signal by the conductor. The conductor gave the signal and the car accelerated its speed before the plaintiff had alighted, causing him to be thrown and injured. The plaintiff's instruction authorized a finding for him if the jury found that the conductor's act caused the injury without requiring a finding that he knew or should have known that the plaintiff was upon the step. In neither that case nor the Hanks case does the court discuss the question of whether a finding that the act involved was *negligently* done amounts to a finding of the knowledge or duty to know, absent which the act would not be negligent.

In Morton v. Southwestern Telegraph and Telephone Co., 280 Mo. 360, 381, 217 S. W. 831, 836, Division Two of this court said:

''A finding by the jury that the defendant negligently caused and permitted the condition mentioned is equivalent to a finding that the defendant knew the condition to exist.''

In Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408, Division One applied the principle in holding sufficient an instruction for the plaintiff which failed to require the jury to find that the defendant knew or in the exercise of ordinary care could have known, of the unsafe condition of the plaintiff's place of work but did require a finding that ''in thus furnishing and providing said place of work, . . . the defendant failed to use ordinary care and was guilty of negligence.'' The court stated that ''it has been repeatedly and consistently ruled by this court that a finding of *negligence* imports knowledge (on the part of the party found to have been negligent) of the unsafe condition of the appliance, or of the place of work;'' and after citing a number of cases, including the Morton case, supra, said:

''The reason for the foregoing uniform holding is readily apparent, for it is obvious that the jury could not well have found that the defendant was *negligent* in furnishing the plaintiff with an unsafe place in which to work without believing (and inferentially finding) that defendant *knew,* or by the exercise of ordinary care could have known, of the unsafe condition of the place of work.'' [322 Mo. l. c. 923-4, 18 S. W. (2d) l. c. 418.]

In Kamer v. M.-K.-T. Railroad Co., 326 Mo. 792, 32 S. W. (2d) 1075, the plaintiff was injured by a car being moved by the defendant's switching crew against one about which he was working. Answering a criticism of the plaintiff's instruction similar to that we are now considering. the court said:

"The instruction does not, in express words, require a finding that defendant knew or in the exercise of ordinary care could have known that plaintiff was between the cars; but, we do not think it must be held erroneous on that account. The finding that defendant under the circumstances was not in the exercise of ordinary care, and was guilty of negligence, is equivalent to a finding that defendant knew or in the exercise of ordinary care could have known plaintiff was between the cars." [326 Mo. 1. c. 805, 32 S. W. (2d) 1. c. 1082.]

The situation presented by the evidence in the Kamer case was such that we think the decision is in point in the instant case. Under the circumstances shown by the evidence herein we think the finding that Hoctor, in moving into plaintiff's path and interfering with his boarding the engine as he was attempting to do, failed to exercise ordinary care and was guilty of negligence is equivalent to a finding that he knew or in the exercise of ordinary care could have known that the plaintiff was so attempting to board the engine.

Moreover, if plaintiff's instruction is, strictly speaking, incorrect in the respect above discussed, defendant is hardly in position to complain. It requested and the court gave an instruction similarly worded in that respect, telling the jury that "before plaintiff can recover in this case he must prove by a preponderance or greater weight of the evidence that John Hoctor . . . moved in the path of plaintiff and interfered with plaintiff boarding the engine . . . and must further prove by a preponderance or greater weight of the evidence that the said John Hoctor was negligent in so doing, and that plaintiff was injured as a direct result thereof, and unless plaintiff has established these facts by a preponderance or greater weight of the evidence he is not entitled to recover in this case," further directing that if the evidence was evenly balanced and the jury could not determine whether or not Hoctor "was negligent under the circumstances," the verdict should be for defendant. The plain and necessary implication from that instruction is that if plaintiff had established the facts hypothesized he could recover. A party will not be heard to complain on appeal of an alleged error which he adopted or in which he participated or acquiesced. We rule this contention against the appellant.

(b) The instruction directs a verdict for the plaintiff if the jury finds that his injury proximately resulted from defendant's negligence as therein required to be found without further requiring a finding that he was himself in the exercise of ordinary care. It does not refer to the defense of contributory negligence nor does it refer to the measure of damages or the amount of recovery. It merely directs that if the hypothesized facts constituting negligence on the part of defendant are found "then your verdict will be in favor of plaintiff and against the defendant herein." Neither side asked nor did the court give an instruction on the measure of damages or

telling the jury that if plaintiff was found to have been guilty of contributory negligence the amount of recovery should be diminished accordingly. Appellant contends that such omission was reversible error. Some of the cases cited in support of this contention are Federal cases not under the Employers' Liability Act and in which contributory negligence precluded recovery. Some are Missouri cases in which, likewise, contributory negligence was a complete bar. None deals with the precise question we have here, viz., an instruction for the plaintiff in an action under the Federal Employers' Liability Act authorizing recovery, but silent as to the amount thereof or the measure of damages upon a finding of the hypothesized .facts constituting negligence on the part of the defendant and without requiring a finding on the issue of contributory negligence. Contributory negligence does not bar recovery under that act. It reduces the amount the plaintiff may recover and the defendant is of course entitled to have the jury appropriately so informed if it requests such instruction. But if the defendant has been guilty of negligence and the plaintiff's injury has resulted in whole or in part therefrom he is entitled to a recovery notwithstanding he may have been guilty of contributory negligence. An instruction so informing the jury is, therefore, not misdirection. The failure to instruct on the measure of damages or what amounts to the same thing, diminution of damages in proportion to plaintiff's contributory negligence, if any, is nondirection rather than misdirection which, under the rule in this State, is not reversible error. This question received consideration by this court en banc in the recent case of Moran v. Atchison, T. & S. F. Ry. Co., 320 Mo. 278, 48 S. W. (2d) 881, wherein the jury was instructed that if they found certain hypothesized facts they should find for the plaintiff although they might further find that the plaintiff's intestate had been guilty of certain negligence which directly contributed to his death. As in the instant case the instruction was silent as to the measure of damages or the apportionment thereof if the deceased had been contributorily negligent and neither side had requested an instruction on that subject. It was held that the plaintiff's instruction purported to submit only the question of the defendant's liability, not the amount thereof, and that as it properly submitted that issue it was not erroneous and that the failure to instruct on the measure of damages or diminution thereof was mere nondirection and was not error. There was a dissent in the Moran case but not on that point. Certiorari was refused by the United States Supreme Court. That case is decisive of the question. Appellant's contention cannot be sustained.

III. It is claimed that the judgment of $20,000 is excessive. Plaintiff gave his age as thirty-two at the time of the trial, a year and nine months after his injury. Prior to his injury he had been in

good health and was earning $160 to $165 per month, with certain seniority rights in his employment affording prospect of advancement. He of course can no longer do work of that character. From March, 1929, to the time of trial, December, 1929, he worked about every other day at a filling station, receiving $3 per day when he worked. He could not work regularly because of the pain and soreness caused by the artificial leg he wore during that time and had done no other work since his injury. Following his injury he was in the hospital forty-one days. His leg was amputated about ten inches below the knee. There is no muscular padding, only the skin, over the end of the stump which is quite tender. Dr. Pernoud, who examined plaintiff a few days before the trial, testified that ''the working left thigh and left leg, that is the stump of the left leg, was atrophied. I mean by that that the muscles and tissues were wasting away;'' that measurements of the stump ''up to a point quarter ways of the calf of the leg,'' showed that member to be three and three-fourths inches less in circumference than the corresponding part of the right leg, which condition is permanent; that the end of the stump is and will remain sensitive; that he found a number of ''globules or boils'' at the point where the artificial leg took the pressure of plaintiff's weight. The ''bruising'' of the stump produced by wearing the artificial leg causes ''a low grade inflammation'' of the stump and swelling of the stump and about the knee and causes the boils; that condition will continue in the future but how long he could not say; some persons are harder to fit properly with artificial legs than others; that in time plaintiff might become able to wear an artificial leg without discomfort, such being generally the case. Plaintiff testified that the stump is very tender and that there is a ''twitching of the nerves;'' that he suffers pain from it every day, whether wearing the artificial leg or not; ''at times it (the pain) is sharp enough to make you jump;'' that he is not able to wear the artificial leg oftener than about every other day and even so it produces the boils and soreness above referred to.

While there can be no fixed standard for the measurement of damages resulting from personal injuries this court has not ordinarily allowed a judgment to stand for more than $10,000 for the loss of a leg below the knee unless there were other injuries or aggravating conditions tending to increase the damages ordinarily incident to such injury. We have examined the authorities cited by counsel, but deem it unnecessary to review them or to discuss the question at length. It has been sufficiently considered by this court heretofore. [See Miller v. Schaff (Mo.), 228 S. W. 488; Foster v. Davis, Dir. Gen. (Mo.), 252 S. W. 433; Kibble v. Q. O. & K. C. Railroad Co., 285 Mo. 603, 621, 227 S. W. 42; Hurst v. C., B. & Q. Railroad Co., 280 Mo. 566, 219 S. W. 566; Kamer v. M.-K.-T. Railroad Co., supra;

Greenwell v. Chicago, M. & St. P. Railroad Co. (Mo.), 224 S. W. 404.]

In Miller v. Schaff, supra, the court thought the circumstances presented "something more than the ordinary case of the mere loss of a leg." The amputation in that case was below the knee. The court reduced a $17,000 judgment to $12,000. The circumstances of the instant case are fairly similar to those presented in the Miller case. We think the same amount may properly be allowed here but no more than that sum.

In accordance with the views herein expressed, the judgment of the circuit court is affirmed on the condition that the plaintiff, within ten days, enter as of the original date thereof, a *remittitur* of $8000, leaving the judgment stand for $12,000 with interest on that amount from date of the judgment; otherwise the judgment is reversed and the cause remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.