LENA TATE v. THE WESTERN UNION TELEGRAPH COMPANY, a Corporation, and AUGUST MOECKLI, Appellants.—76 S. W. (2d) 1080.

Division Two, December 1, 1934.

*Jones, Hocker, Sullivan & Angert* and *Ralph T. Finley* for appellants.

84

*Mark D. Eagleton* and *Allen, Moser & Marsalek* for respondent.

FITZSIMMONS, C.—This case comes to the writer upon reassignment.

Defendants, the Western Union Telegraph Company and August Moeckli, its servant, appeal from a judgment in the sum of $15,000 against them rendered in the Circuit Court of the City of St. Louis. Their assignments of error are the overruling of their demurrers, the giving of an instruction and the excessive verdict. Plaintiff's cause of action was for damages for electric shock and resultant injuries suffered when a telegraph wire of the defendant company crossed high-tension wires of the Union Electric Light & Power Company. The demurrer of the third defendant, Whitaker, was sustained and plaintiff dismissed the case as to him.

The appealing defendants urge these reasons why the demurrers should have been sustained: (1) The evidence fails to show that the alleged injuries were the proximate result of the negligence charged. (2) Defendants could not, reasonably and naturally, have anticipated the injuries which were the result of so extraordinary and unusual an occurrence that the alleged negligence cannot be said to have been the cause of them. (3) Plaintiff suffered alone from fright or mental shock and received no physical injuries independent of the fright and mental shock. We will state first the facts bearing on the first two grounds, and second, we will summarize the evidence showing the nature of her injuries.

Plaintiff, Lena Tate, lived with her husband and children in a first floor flat at No. 16 South Sarah Street, St. Louis. Sarah Street runs north and south and the flat is on the east side of the street. On the south side of the flat is a public alley which runs from Sarah Street eastwardly. Across the alley from the flat is Brauer Brothers shoe factory, a five-story building, which also fronts on Sarah Street. In this alley between the flat and the shoe factory is a line of poles on which, on October 3, 1926, the Union Electric Light & Power Company had three or four wires carrying currents of 13,200 volts. These wires were bare, insulation being a useless thing on high-tension lines. On the morning of the day stated Mrs. Tate was putting her house in order. She was in the kitchen, the window and door of which were open to the back yard. Iron rails were on each, side of the steps. She had cleaned the kitchen floor with a wet mop. She was putting away the mop and was reaching for the broom when there was an explosive noise, a brilliant illumination of the kitchen, and a dash of what seemed flames which singed her face, hair and eyes. At once Mrs. Tate fell to the floor. Plaintiff testified that the explosive noise was "terrific," being louder than the report of a shotgun, pistol or bomb. All witnesses who heard the noise including the telegraph company's linemen, testi-

fied that it was very loud. It drew the curious to the alley and to plaintiff's premises.

The cause of the noise and the brilliant light was a contact of an insulated wire owned by defendant telegraph company with one or more of the high-tension power wires. The telegraph company had moved one of its branch offices in the Sarah Street neighborhood. This change made useless a span of iron message wire about two hundred feet long. The wire stretched in a northeasterly direction from the roof of the shoe factory, across the alley, over the power wires, over plaintiff's yard and to a pole in an area way immediately north of plaintiff's premises.

The message wire being no longer needed, the telegraph company sent a crew of linemen to take it down. Defendant Moeckli, in charge of the crew, went to one end of the wire on the roof of the shoe factory, while lineman Whitaker climbed the pole to which was fastened the other end. Moeckli knew that the power wires were in the alley and that in the taking down of the message wire contact with the very dangerous high-voltage lines was to be avoided. But let him tell it. Called as a witness for defendant, Moeckli testified:

"Q. Now, you and Mr. Whitaker were engaged in the removal of this wire? A. Yes, sir.

"Q. How were you removing it, just tell the court and jury what steps you were taking to remove it? A. I went on the building with a rope, cut my end of the wire off and tied this rope on, and Whitaker, he was to get on the pole on the other end and pull the wire down . . . I was to hold up the wire with the rope to keep it from coming on this hot stuff, and when I cut it I slacked my arm back like this because there was quite a little strain on it, and when I did that I got a slight shock, and the first thought that came to my mind was that I better let loose, and just then there was a report and a little flash and that was all there was to it. The wire fell down across the tree over in the yard, and I looked down in the yard right away to see if there was anybody down there or in the alley and there was nobody there or in the yard, either, that I could see."

Plaintiff in her case in chief, read defendant Moeckli's deposition in which he testified:

"Q Your purpose, at any rate, in going up there and taking down the wire was to avoid contact with those hot wires? A. Yes, sir.

"Q. And the purpose of avoiding contact was because you knew if an object of that kind dropped on the hot wire there would be an explosion and burning of the wires didn't you? A. Yes, sir."

When Moeckli felt the shock he had let the wire slack to within two or three feet of the high tension lines. He was acting for

his own safety against a further or more severe shock when he allowed the wire to slip from his hands and to fall upon the high power wires. And he looked to see whether there was anyone in peril below, only after he had released the wire. His testimony was sufficient to take to the jury the questions of negligence and proximate cause if there also was evidence to support a causal relation between the crossing of the wires and plaintiff's injury. There is no place here for those cases the facts of which show the intervention of the act of a third person between the injury of a plaintiff and the negligence imputed to a defendant. [Kennedy v. Independent Quarry & Construction Co., 316 Mo. 1. c. 791, 291 S. W. 475; Sullivan v. Jefferson Ave. Ry. Co., 133 Mo. 1, 34 S. W. 566.] Even the leading case of Fuchs v. City of St. Louis, 167 Mo. 620, 67 S. W. 610, upon which defendants lean heavily presents several elements of acts of intervention of third persons which are absent here. Nor do we see any pertinency in those cases which hold that a defendant is not negligent when the event complained of could not have been anticipated by ordinary care. [Ward v. Ely-Walker D. G. Bldg. Co., 248 Mo. 348, 154 S. W. 478.] "Due care is always commensurate with the dangers." [Neal v. Curtis & Co. Mfg. Co., 328 Mo. 389, 41 S. W. (2d) 543, 1. c. 555.] And just as in the Neal case, the plaintiff at work in a box car unloading its cargo was helpless to protect himself from the impact of a coupling locomotive, so, too, here the plaintiff in her kitchen was helpless to protect herself from a shock of the most dynamically incalculable force known to man. And due care on the part of defendants was commensurate with the peril of the force to which Moeckli by his act gave momentary freedom.

■ Was the evidence sufficient to submit to the jury the question whether plaintiff received an electric shock as a result of the contact of the message wire with the power wire? Plaintiff testified that after she fell to the floor of the kitchen she worked her way to the door to call help and she saw wires lying on the steps a few feet away. Mrs. Tate's upstairs neighbor, Mrs. Neff, who was washing dishes when the explosion occurred and had some of her dishes broken, hurried downstairs and entered Mrs. Tate's kitchen. Mrs. Neff testified that she saw wires lying on Mrs. Tate's steps and across the iron railing and that the telegraph company's linemen who were standing in the yard cautioned her to avoid the wires. The men of the crew denied this. They testified that the nearest part of the message wire to Mrs. Tate's door was hung on a tree in the yard, twenty-five feet from the kitchen door. Where the ends of the message wire were after the explosion was a question for the jury of course.

Of the shock to himself, Moeckli, in his deposition read in evidence, testified:

"Q. Where did you get this shock from, the one that you got? A. I must have got it off of that wire I cut off.

"Q. This dead wire? A. Yes, sir. You see this hot stuff like that 13,200, I was standing in water on this roof, I was grounded, and this hot stuff when it is that strong will jump through the air to the ground, that is what happened in that case.

"Q. In other words, this 13,200 volts is sufficient in its jumping propensities that it will jump seven or eight feet high to a ground? A. Yes, sir.

"Q. Comes through the air? A. Yes, sir.

"Q. And it will follow, once it jumps to the ground, follow the course of that to the end of the ground? A. Yes, sir.

"Q. And you were at the other end and standing in water, is that right? A. Yes, sir."

Whitaker, the lineman on the pole two hundred feet away from Moeckli on the roof, received a shock just about a second before the flash and explosion. He called it a slight shock which burned his fingers a little bit but did not cause him to fall from the pole or to suffer any inconvenience or to quit work. But, on cross-examination, he admitted that in a deposition which he gave in 1926, shortly after the accident, he testified that the shock made him dizzy, burned his index finger, and affected his stomach although he was not touching the mesage wire at the time. He ascribed the shock to the fact that the pole was wet. There had been record breaking rains for days before the accident. But though it be that Moeckli, standing in water on the roof and Whitaker clinging to a wet pole received secondary or minor shocks when the message wire came within two or three feet of the power line, defendants would have us to hold as a matter of law that plaintiff, standing on a wet floor, did not and could not have received a shock by reason of the actual contact of the message wire with the high-tension wires. In our opinion this was a question for the jury.

We take notice of the fact that the message wire would not divert the power current from its normal course unless the wire while touching the power line had a "ground" or ultimate earth connection through good conductors, or unless the message wire contacted at the same time two or more of the power wires. The current did not seek to reach the earth through the message wire to the pole to which Whitaker was clinging because he received but a slight shock and that before the explosion and blaze. It is a reasonable inference therefore that the current went the other way, that is, through the end of the wire which Moeckli dropped. It is also an inference which the jury with reason might draw that when Moeckli dropped the wire, his end of it either swung to and contacted the iron rails of plaintiff's porch or came near enough to the railing for the current to jump, while the power wires were burning the message wire in

two pieces some distance from the dangling end which Moeckli had dropped. We need not marshal conflicting measurements or distances and relative positions. It is enough to say that plaintiff's back porch was next to and very close to the north side of the twenty-foot alley. The power lines ran along the north side of the alley about forty feet high. The message wire in its fixed position was approximately at right angles to the power lines. When Moeckli dropped the wire, he was on the south side of the alley on the roof of the shoe factory above the power lines and just across the alley from plaintiff's porch. The message wire was made to carry 110 volts of electricity. When it contacted 13,200 volts, Moeckli on the roof saw flames and heard an explosion. Whitaker on the pole waited half a minute for the smoke to clear so that he could see whether Moeckli survived. The very capable electrical expert whom defendants produced as a witness testified that electricity travels with the speed of light. In these circumstances it was for the jury to say whether the message wire, dangling over the north side of the alley and charged with a voltage of electricity one hundred and twenty times its capacity contacted plaintiff's porch. A measureable interval of time passed during the burning of the message wire, and, in that period, electricity with a light velocity of 186,000 miles per second could go far and do much damage.

Defendant offered testimony to the effect that, even if the message wire, charged with the power current, were on plaintiff's back steps, she in her kitchen could not be shocked. Plaintiff's expert testified that, in view of the moist kitchen floor and the generally wet conditions resulting from preceding days of rain she could be shocked. It is not for us to declare, as a matter of law, what are the possibilities of high-voltage electricity when unchained and at large, so to say. The facts in this case differ from those in the case of Chittick v. Philadelphia Rapid Transit Co., 224 Pa. 13, 73 Atl. 4, 22 L. R. A. (N. S.) 1073. And we would hesitate to be as dogmatic in the field of physical science and especially of electricity as the Supreme Court of Pennsylvania was in that case.

From what we have said, we conclude that the trial court rightly overruled the demurrer, provided that plaintiff did not suffer alone from fright and mental shock. The testimony of plaintiff and of physicians was sufficient to make it a question for the jury whether plaintiff received an electrical shock. Therefore we decide against defendants their first assignment of error.

■ I. Defendant telegraph company assigns error to plaintiff's main instruction for the reason that it raises against defendant the presumption of negligence which is indulged in general negligence cases. The instruction made pertinent hypothetical recitals and then added: "The court instructs you that under the circumstances here-

inbefore detailed, if you so find, the law presumes that said defendant was guilty of negligence in permitting its wire to fall and come in contact with said high tension wire or wires, if you do so find, and the burden is cast upon the defendant to prove by the greater weight or preponderance of the evidence the fact that it was not negligent, and in this connection you are instructed that under the circumstances herein detailed, if you so find, it was the duty of said defendant to exercise the highest degree of care practicable while handling its wires under the circumstances hereinbefore mentioned, and a failure to exercise such degree of care would constitute negligence.''

The law is well settled in Missouri that the doctrine of *res ipsa loquitur*—the general negligence rule—does not apply where the plaintiff bases his recovery upon specific acts of negligence alleged in his petition instead of charging negligence in general terms. [Kuhlman v. Water, Light & Transit Co., 307 Mo. 607, 1. c. 637, 271 S. W. 788.] And even though general negligence is pleaded but plaintiff gives evidence of specific acts of negligence, he is not entitled to an instruction which submits to the jury the presumption of defendant's negligence. [Allen v. Missouri Pacific Ry. Co., 294 S. W. 80, 1. c. 87.] Cases of passengers, injured by derailments or collisions of cars of common carriers (Chlanda v. St. Louis Transit Co., 213 Mo. 244, 112 S. W. 249; Price v. Metropolitan Street Ry. Co., 220 Mo. 435, 119 S. W. 932), and cases of persons crushed by falling objects (Duffy v. McGee, 196 Mo. App. 395, 195 S. W. 1053; Kean v. Smith-Reis Piano Co., 206 Mo. App. 170, 227 S. W. 1091) are favorites of the law of general negligence. One reason for the rule common to all these cases is that the injury results from an unusual event, the cause of which, if known to any one, is peculiarly within the mind of defendant and is beyond the ken of plaintiff. It is just therefore that defendant explain, if he can, the cause of the accident. Hence the legal presumption of negligence which defendant must put to flight. But if in a passenger case or a falling object case, plaintiff either pleads or gives evidence tending to prove specific negligence, he is not entitled to the benefit of the presumption.

We are of opinion that, in the instant case, plaintiff was not entitled under her pleadings or evidence to an instruction which told the jury the law presumes under certain hypothecated facts that the defendant telegraph company was negligent. Plaintiff's third amended petition upon which she went to the jury charged that the defendant telegraph company was engaged in the business of transmitting messages by wire, and owned and possessed the wire of which we have made frequent mention and that defendants Moeckli and Whitaker were in the employ of the defendant company as linemen. The petition further alleged ''that on or about October 1, 1926, plaintiff was in the kitchen of her home at 16 South Sarah Street in the

city of St. Louis, Missouri, and that immediately in the rear of her residence defendants were engaged in removing a wire located close to plaintiff's aforesaid home, and that while so doing defendants negligently and carelessly caused and permitted their said wire to fall and come in contact with a high-tension wire or wires, carrying a deadly and dangerous current of electricity causing an explosion and an extremely loud and terrifying report, and flames and smoke to be emitted, and said wire did fall upon said premises in close and dangerous proximity to the plaintiff, all of which caused plaintiff to be thrown, shocked and injured, as hereinafter more particularly alleged, all of which directly and proximately resulted from the joint and concurrent negligence of all of the defendants.''

It seems to us that this petition was as specific in its allegation of negligence as the simplicity of the act of carelessness permitted or required. But if there be any doubt on this point, no question of the specific nature of Moeckli's testimony can be raised. The only evidence given on behalf of plaintiff concerning the crossing of the wires was the deposition of Moeckli. In that deposition, part of which we have quoted, Moeckli stated that he went upon the roof of the shoe factory; that there he cut one end of the wire and he either tied or intended to tie a rope to that end; that he allowed the wire to sag until it came within two or three feet of the high-tention wires; that he then felt a slight shock due to the attraction of electricity through the air from the power wires to the message wire and that thereupon he dropped the message wire. Moeckli's deposition makes it very clear that he released the message wire in order to save himself from a more severe shock and that at the time that he released the wire he knew that the power wires were in the alley below. In fact the whole plan for the taking down of the message wire was predicated upon the avoidance of contact between this wire and the power lines. Moeckli was the man in charge of the execution of this plan and was the man who, for his own safety, as he thought, dropped the wire contrary to the plan of safe action. In these circumstances there does not appear to be any room or place for the application of the doctrine of *res ipsa loquitur*. Therefore the instruction given on behalf of plaintiff was prejudicially erroneous.

In this view of the case it will not be necessary for us to discuss the question of the size of the verdict.

II. For the reason that the trial court erred in giving plaintiff's main instruction, the judgment is reversed and the cause is remanded. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur in result as expressed in concurring opinion of *Tipton, J.,* filed herewith.

TIPTON, J. (concurring).—I do not agree with the reason assigned for holding the plaintiff's main instruction erroneous. But I do believe the instruction is erroneous for the reasons assigned in the case of McCloskey v. Koplar, 329 Mo. 527, 46 S. W. (2d) 557, 92 A. L. R. 641, note, and, therefore, I concur in the result reached. *Ellison, P. J.,* and *Leedy, J.,* concur.