LENA TATE v. THE WESTERN UNION TELEGRAPH COMPANY, a Corporation, and AUGUST MOECKLI, Appellants.—96 S. W. (2d) 364.

Division Two, August 20, 1936.

*Jones, Hocker, Gladney & Jones* for appellants.; *Francis R. Stark* of counsel.

*Mark D. Eagleton* and *Moser, Marsalek & Dearing* for respondent.

BOHLING, C.—The Western Union Telegraph Company and August Moeckli, its servant, appeal from a judgment awarding Lena Tate $17,500 damages for an alleged electric shock and resultant injuries received on October 1, 1926, when a message wire of the telegraph company came in contact with high tension wires of the Union Electric Light & Power Company. The decision on the first appeal is reported in 336 Mo. 82, 76 S. W. (2d) 1080.

The defendants contend plaintiff failed to make a submissible case in that (1) the physical facts demonstrate it was impossible for the telegraph wire to have been in contact with the high tension wire and the porch, mentioned in evidence, of plaintiff's flat, so as to afford a means whereby plaintiff might suffer an electrical shock; (2) that it is impossible to conceive of electric current being transmitted from plaintiff's said porch to where plaintiff testified she received the shock in her kitchen; and (3) that it is inconceivable that a current passing over the kitchen floor might have affected plaintiff standing upon it. The contentions call for an examination of the physical facts established by the testimony and exhibits, drawn to scale, showing a plat and the elevation of the structures involved, together with the natural and reasonable inferences arising therefrom, viewed in the light most favorable to plaintiff. [Tash v. St. Louis-S. F. Ry. Co., 335 Mo. 1148, 1159(1), 76 S. W. (2d) 690, 695(2); Johnson v. Chicago & E. I. Ry. Co., 334 Mo. 22, 30(1), 64 S. W. (2d) 674, 677(1-3); Gratoit v. Missouri Pac. Ry. Co., 116 Mo. 450, 466, 21 S. W. 1094, 1098.]

Plaintiff lived at No. 16 Sarah Street, St. Louis, Missouri, in one of the downstairs apartments of a two story four apartment building. Sarah Street runs north and south. The rear of the flat is seventy-six feet six inches east of the east line of Sarah Street. Plaintiff's back porch, made of concrete and eight feet wide, extends three feet six inches east and the steps, having iron handrails on either side, an additional four feet two inches east, a total distance of eighty-four feet five inches east of Sarah Street. The south wall of said porch appears to be approximately eight inches north of the south wall of said flat, and the handrails on the steps appear to reach a height of seven feet. An east and west public alley is immediately south of plaintiff's apartment. Proceeding south across the alley from the flat, it is four feet six inches to the center line of a pole supporting a three phase 13,200 volt uninsulated (insulation being useless) electric high tension circuit of the Union Electric Company, a corporation, and an additional fifteen feet three inches to the north wall of the Brauer Bros. building, a building across the alley from

plaintiff's flat and extending eighteen feet nine inches east of the east wall of said flat. The exact position of said pole with reference to the east wall of said flat is not shown. Crossarms extending southward from the pole support the high tension line forty-three feet above the surface of the alley and approximately seven and one-half feet south of the south line of the porch. The top of the coping on the Brauer building is fifty feet above the alley and the coping extends approximately two to three feet above the roof of the Brauer building. At the southeast corner of the Brauer building is a chimney, extending approximately nine to ten feet above the coping. Twenty-four feet five inches south of the north wall of the Brauer building is the north wall of a structure housing elevator equipment and described as a "penthouse," its east wall being imposed upon the wall of the Brauer building. The penthouse is approximately nine to ten feet square and eight feet in height.

Some time previous to the accident, defendant telegraph company had moved one of its offices in the Sarah Street neighborhood. This made a span of iron message wire useless. This wire extended from a stub pole fifteen feet high and eighty feet east of the east line of Sarah Street to a point on the chimney or on the penthouse on the Brauer building, the pole being 125 feet ten inches north of the north wall of the Brauer building. After the explosion hereinafter mentioned, a severed piece of the message wire, estimated close to twenty feet in length was found in the alley.

Defendant telegraph company sent a crew to take down the message wire on the morning of October 1, 1926. Defendant Moeckli was one of the crew. He went to the roof of the Brauer building while a lineman, Ray Whitaker, ascended the stub pole. Moeckli took a rope with him, it being the intention to have Moeckli cut the message wire and attach the rope, it being a nonconductor, and for Whitaker to keep the wire and rope taut and pull in the message wire so as to avoid contact between said message wire and the high tension wires, and thus lower the message wire. When Moeckli cut the message wire he slacked his arm on account of the strain and received a slight shock, whereupon he released the wire. There was a report and a flash. Plaintiff had just finished cleaning her kitchen floor with a wet mop and was reaching for a broom when the explosion and flash occurred. She testified that there appeared to be a dash of flames, that she received a shock, fell to the floor and received injuries. Mrs. Neff, who occupied the upstairs apartment above plaintiff, testified that she was washing dishes at the time of the explosion and had some of her dishes broken; that she hurried downstairs; and both she and plaintiff testified that they saw the wire lying on plaintiff's steps across the iron railing immediately after the explosion.

Assuming the message wire remained attached to the stub pole,

do the facts outlined above demonstrate it to be a physical impossibility for said message wire to have come in contact with one of the high tension wires and the railing of plaintiff's porch and thus preclude the establishment of said portion of the electric circuit by means of which plaintiff claims to have received an electric shock?

Defendants stress the testimony given at the trial of defendant Moeckli that the message wire was attached to the chimney on the Brauer building (approximately five feet above the roof and two feet south of the wall of said building). However, plaintiff offered in evidence in chief the deposition of said defendant Moeckli taken in the instant case on May 28, 1928, wherein said defendant testified that the wire was fastened to the northeast corner of the penthouse. This testimony, adduced through the deposition and offered in evidence by plaintiff without objection, had probative value and constituted substantive proof that the message wire was attached to said penthouse. [Pulitzer v. Chapman, 337 Mo. 298, 317, 85 S. W. (2d) 400, 410 (discussion 5-10); Berry v. Peacock C. & D. Co. (Mo. App.), 253 S. W. 456, 460(13). See also Sugarwater v. Fleming, 316 Mo. 742, 752(3), 293 S. W. 111, 115(5).]

We are in accord with the rule of law that "when the testimony of a witness upon a material issue is contrary to the physical facts, or when such testimony necessarily relied upon is inherently impossible, or the inferences deducible therefrom are so opposed to all reasonable probability as to be manifestly false, the courts are not bound to stultify themselves by giving credence to such testimony, but will wholly disregard it" [Roseman v. United Rys. Co. (Mo. App.), 251 S. W. 104, 106(2), citing cases]; but the facts of the instant case and the variable factors existing preclude the application of the rule here. The testimony, viewed in a favorable light to plaintiff, established that it had been raining for several days, although it was not raining on the day in question; that plaintiff's kitchen linoleum was wet or damp, having just been mopped by plaintiff; that the message wire, designed to carry 110 volts of electricity upon coming in contact with the high tension electric line of the Union Electric Company and forming a short circuit or ground, would fuse or vaporize, the insulation on the message wire being insufficient to afford protection against the 13,200 volt circuit; that this fusing or vaporizing of the message wire would not necessarily be instantaneous but would take an appreciable time depending upon the adequacy of the contact and the character of the insulation to be burned through, and would occur at the point where the message wire was electrically the weakest, like a chain, and not necessarily at the point of contact with the high tension wire (plaintiff's expert testifying: "Q. Would it likely go up at the point of contact? A. No; it will fuse at the weakest place, like a chain"); and that upon the fusing

of the message wire it would cease to be a conductor as the circuit would thereby be broken. Under this testimony the significance attached to the estimated twenty foot length of the severed message wire found in the alley after the explosion ceases to have the importance attached to it by counsel for defendants; for if it would fuse where electrically the weakest counsels' contention based upon the assumption that it fused at the point of contact forty-three feet above the surface of the alley and could not then have been in contact with the railing of plaintiff's back porch, is based upon a premise at variance with facts adduced on behalf of plaintiff and for the determination of the jury. Assuming, as we must, that the message wire was attached to the penthouse, the facts in evidence and deductions from physical laws based thereon do not so clearly and irrefutably disprove the possibility of said message wire being in contact with a wire of said high tension circuit and the north rail of plaintiff's porch as to preclude all reasonable probability of such an occurrence. A straight edge placed on the plat from the northeast corner of the penthouse to the stub pole passes over the steps of plaintiff's rear porch. The exhibit showing the elevation of the structures discloses that a message wire strung in a straight line from the northeast top corner of the penthouse to the stub pole would pass through the coping of the Brauer building; and it may be demonstrated on said exhibit that it is a possibility for a wire twenty feet less in length than the length necessary to reach from the stub pole to the penthouse to be in contact with the north wire of the high tension circuit and the north rail of plaintiff's porch. It appears no opening existed in the coping for the message wire. If said wire passed over the coping, its length would be slightly increased. Furthermore, consideration should be given to any slack existing in the message wire and in the high tension wire, which we do not find developed in the evidence. The length of the severed piece of message wire was estimated at close to twenty feet. If its actual length was shorter, the probability of the aforesaid contact would be correspondingly increased. If the message wire fused at its electrically weakest point between the high tension wire and the rail on plaintiff's steps, the greater the distance this fusing occurred from the high tension wire the greater would be the probability of said message wire being in contact with said handrail. The contention is ruled against defendants.

The other contentions to the effect it was not possible for plaintiff to receive an electric shock are fully developed, discussed and ruled in the opinion on the former appeal [336 Mo. 88(2), 76 S. W. (2d) 1082 (3, 4)], and need not be repeated here.

The jury returned a verdict for $25,000; and judgment, after a forced *remittitur* of $7500, was entered for $17,500. Appellant insists the verdict, before *remittitur*, and the judgment, after *re-*

*mittitur*, are so grossly excessive as to require a new trial or a further *remittitur*.

Plaintiff testified that she was thirty-nine years of age and in perfect health at the time of the accident; that upon the occurrence of the report and flash she fell to the floor, striking a table and chair; that she was dazed for a couple of minutes and had to work herself up; that she immediately suffered pain in her shoulder, her back, from the shoulder to just above the waist line, and ankle on the left side; that she suffered pain in her head and flashes before her eyes constantly for a long time and the headaches, sometimes severe, continue; that her heart bothered her; that she suffered a numbness in her limbs; that her menses were painful and irregular and this condition, although not as pronounced, existed at the time of the trial; that she has suffered constantly with her back and when she stoops or bends she suffers intense pain; that her nerves are in a very poor state and she is not able to go places on account of her nervousness and embarrassment; that if she "happens to go downtown lots of times," she has to stop and regain herself, her foot becomes stiff and she has to wait to overcome it; that she has tremors in her body, spells of nervousness starting from her foot and reaching to her shoulder; and that her nervous condition constantly affects her sleep and rest.

Dr. Arthur H. Deppe, a specialist in nervous and mental diseases, testified he examined plaintiff on November 21, 1928; that she was suffering from functional or psycho-neurosis, commonly known as nervousness; that she had a slight Rhomberg, attributable to her nervousness; that she suffered from anesthesia, having a complete loss of sensation to a pin prick over the left half of her body, head and neck, a type of anesthesia found in highly nervous people; that her reflexes appeared normal; that he again examined plaintiff on December 19, 1934; that her lower tendon reflexes were hyperactive; that she did not have a complete anesthesia to the left side of her body, although her perception to pain there was not as distinct as on the right side; that she still manifested other symptoms of nervousness; that her nervous condition was probably not as bad as on the first examination; that there was no evidence of any structural change in the nervous system and she manifested only functional conditions; and that plaintiff, in his opinion, would not completely recover. Dr. F. G. Pernoud testified he examined plaintiff's back in January, 1935, with reference to the surgical aspects of the case and diagnosed her condition as hypertropic arthritis of the spine—arthritis involving the joints of the spine and the rims about the spine bones; that the movements of the spine were limited and plaintiff was unable to arch the spine normally in any direction; that the condition is disabling, painful and permanent in character. There was testimony from other experts to like effect; although defendants offered evi-

dence tending to minimize the extent and permanency of plaintiff's injuries and suffering.

Plaintiff suffered no bone fractures. The bruises she received disappeared in a couple of weeks. She has gained in weight since the occurrence. She was at the age the menopause condition sets in and nervousness accompanies that condition. She was confined to her bed for three weeks and treated once a week by a physician during that time and has been treated by physicians at intervals since. She is able to attend the lighter household duties but when she feels good and attempts more she becomes upset. She makes trips downtown and to her physicians. As disclosed by the instant record and the record on the former appeal [see Bushman v. Barlow, 321 Mo. 1052, 1062, 15 S. W. (2d) 329, 332(6)], plaintiff sued for $5000 in her original petition, which amount was changed to $3000 when defendant telegraph company presented an application for removal to the Federal court; that thereafter employees of said corporate defendant were made parties defendant and the amount was raised to $15,000; that, upon trial on said petition, judgment was had for $15,000 and defendants contended the amount was excessive but this court found it unnecessary to discuss said issue [336 Mo. 82, 92, 76 S. W. (2d) 1080, 1084]; and that, upon the case being remanded, the amount was changed to $25,000 and the jury returned a verdict in said sum, and, upon forced *remittitur*, judgment was entered for $17,500.

The injuries sustained by plaintiff do not appear to be as disabling, etc., as the somewhat similar injuries discussed in Manley v. Wells (Mo.), 292 S. W. 67, 69(5), and Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 926(3), 18 S. W. (2d) 408, 419(10), sustaining awards of $15,000 and $18,000, respectively; and after a review of cases bearing more or less directly upon the issue [Zichler v. St. Louis Pub. Serv. Co., 332 Mo. 902, 916(13), 59 S. W. (2d) 654, 659(18); Carpenter v. Wabash Ry. Co., 335 Mo. 130, 137(3), 71 S. W. (2d) 1071, 1075(4); Partello v. Missouri Pac. Ry. Co., 240 Mo. 122, 142, 145 S. W. 55, 61; Barr v. Kansas City, 121 Mo. 22, 32(4), 25 S. W. 562, 564(4); Chlanda v. St. Louis Transit Co., 213 Mo. 244, 263(3), 112 S. W. 249, 253(3)], we are of opinion the judgment should not be in excess of $12,500.

If, therefore, plaintiff, within ten days, will enter a *remittitur* of $5000, the judgment appealed from will be permitted to stand for $12,500 as and of the date of its original entry; otherwise, this cause is reversed and remanded. *Cooley* and *Westhues*, CC., concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.